HAROLD G. HERRIN, APPELLEE, v. JOHNSON CASHWAY LUMBER COMPANY, A CORPORATION, ET AL., APPELLANTS.

46 N. W. 2d 111

Filed February 2, 1951. No. 32852.

*Gaines, Shoemaker & Crawford,* and *Wear & Boland,* for appellants.

*Webb & Kelley, H. B. White,* and *Eugene D. O'Sullivan, Jr.,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action in equity brought by Harold G. Herrin as plaintiff in the district court for Douglas County, against the Johnson Cashway Lumber Company, a corporation, the Johnson Investment Company, a corporation, and the officers of the corporations consisting of Lawrence W. Johnson, president, Harold R. Johnson, vice president, George W. Bunce, secretary, and Julia E. Johnson, treasurer, to require the defendants to carry out the terms of an alleged oral contract to repurchase stock held by the plaintiff in the corporations, and to enter judgment in his favor for a balance claimed to be due for salary earned while in the employ of the corporations.

The plaintiff's second amended petition alleged an oral

contract wherein the president of defendant corporations agreed to repurchase stock at book value in the corporations in the event of plaintiff's death or termination of employment, and also a claim for unpaid salary. The defendants' answer is a general denial, and in addition a counterclaim that the plaintiff fraudulently and unlawfully did draw a check against the funds of the Johnson Cashway Lumber Company, a corporation, and caused the same to be presented to the bank and obtained the avails thereof in the amount of $2,500, for which amount judgment is prayed. Plaintiff's answer to the counterclaim is a general denial and an affirmative allegation that the plaintiff had a credit with the corporations which he is entitled to assert as against defendants' counterclaim.

The trial court entered judgment in favor of the plaintiff and against the defendant Johnson Cashway Lumber Company in the amount of $16,122.12; entered judgment in favor of the plaintiff and against the Johnson Investment Company in the amount of $3,235.56, the book value of stock of the two corporations, including interest; and also entered judgment in favor of the plaintiff and against the defendant Johnson Cashway Lumber Company for salary due the plaintiff in the amount of $3,584.58. The action was dismissed as to the defendants as individuals.

Upon the overruling of the motion for new trial filed by the Johnson Cashway Lumber Company, a corporation, and Johnson Investment Company, a corporation, the corporations appeal.

This appeal involves two separate causes of action. The first deals with an oral contract to repurchase stock in the corporations upon the death or termination of employment of the plaintiff at the book value of the stock at such time. The second cause of action is to recover an unpaid balance of salary due the plaintiff from the defendants. We relate the factual situation covering these separate causes of action in chronological order.

For convenience we will refer to the defendant Johnson Cashway Lumber Company, a corporation, as the lumber company; Johnson Investment Company, a corporation, as the investment company; Lawrence W. Johnson, president of the corporations, as Johnson; and the plaintiff Harold G. Herrin as Herrin.

It appears from the record that Herrin entered the employ of a co-partnership, composed of Lawrence W. Johnson, Harold R. Johnson, and their mother Julia E. Johnson, engaged in the lumber business on April 1, 1944. He was to manage a lumberyard in Omaha taken over by the partnership, for which he testified he would receive $300 a month salary and a minimum of 5 percent bonus on the net profits. The partnership was incorporated May 31, 1946. There was no change in the ownership of stock, all of it, with the exception of the shares purchased by Herrin, belonged to members of the Johnson family with Lawrence W. Johnson owning the major share thereof. The bonus arrangement, Herrin testified, continued until the incorporation. Several months prior thereto Herrin discussed with Johnson the purchase of stock in the corporations to be formed. In this conversation it developed that Johnson was desirous of patterning the lumber company after firms which had a policy that permitted the employees thereof, and especially the managers, to acquire stock and participate in the profits as an incentive to build business. Within a month after the corporations were formed Johnson inquired of Herrin how much stock he wanted to purchase. Herrin stated he wanted to purchase $10,000 worth of stock. After checking over the proposition Johnson stated he would not sell Herrin that much stock for the reason that he was personally carrying the financial burden of the corporations and was required to borrow large sums of money, and it would not be fair to Herrin to sell him that much stock. He informed Herrin that his credit on the corporation books amounted to $6,600. He said he would sell stock to Herrin in that amount, two-thirds

of which, amounting to 44 shares at par value of $100, would be in the lumber company, and one-third or 22 shares at par value of $100 would be in the investment company. Herrin testified that at the time he was negotiating for the purchase of the $10,000 worth of stock, Johnson stated that minority stock in a closed family corporation was undesirable, and in that connection he would agree to repurchase the stock at book value in the event something happened to Herrin, or in the event Herrin terminated his services. Herrin testified at the time the stock was purchased, Johnson said he wanted an agreement whereby Herrin would agree to first offer the stock to him, and he agreed in turn to buy the stock at the existing book value. Herrin testified: "* * * maybe he said I was to offer that stock to him first." When the checks were prepared and endorsed, the secretary of the corporations who had handled the matter stated Johnson wanted him to prepare a written agreement, which was not done. Herrin stated he asked the secretary to be sure and stipulate the book value as to the repurchase arrangement.

Herrin terminated his employment with the corporations on April 1, 1948. Before doing so he stated the terms of the oral agreement to Harold Johnson, the vice president of the corporations, and a week or so after terminating his employment he talked with Johnson and offered to sell him the stock in accordance with the oral agreement. At that time Herrin was in Hastings and contacted Harold Johnson and Lawrence Johnson. Harold Johnson requested Herrin to explain his agreement. Herrin started explaining the original bonus agreement. Johnson became suddenly angry, denied that Herrin was entitled to a bonus, and stated that he was not going to pay him anything, that he was going to penalize his stock, that he never wanted to see him again, and ordered him to get out. Herrin did not offer to deliver the stock to Johnson at that time, but did so several days later when he personally took Johnson a

letter setting forth the value of the stock and the amount
due for salary. He requested him to have the auditor
check it. Johnson said: " 'I think your valuations on
the investment company are about right.' " It was stip-
ulated that the book value of the stock in the investment
company on May 31, 1948, was in the sum of $132.32
per share. Johnson further said: " 'I think your valu-
ations on the corporation are about twenty-five dollars
high.' "

The letter Herrin delivered to Johnson is in substance
as follows: It is dated March 30, 1948, and is directed
to L. W. Johnson, president, Johnson Cashway Lumber
Company. It is stated therein that, as suggested by Mr.
H. R. Johnson, he had obtained the services of a compe-
tent auditor who had arrived at the book values on stock
which he held in both Johnson Cashway Lumber Com-
pany of Omaha and Johnson Investment Company. These
values were: Johnson Cashway Lumber Company, 44
shares of book value $344.48 per share, total $15,157.12;
22 shares of Johnson Investment Company, $3,094.74;
and unpaid salary $3,000, a total of $21,251.86. The letter
concludes: "I wish to immediately dispose of this stock
and in compliance with former agreement, am offering
this to you before placing stock on market. I would
appreciate your decision as I wish to run an ad in Sun-
days paper advertising this stock."

After delivering the letter to Johnson, Herrin saw
him the next day. Johnson told him: "I am going to
give you an ultimatum. I want this twenty-five hundred
dollars surrendered on Saturday." Herrin said he did
not have it and was not going to surrender it. This
$2,500 item is one Herrin claims was drawn against his
salary before terminating his services, and constitutes
the basis of the defendants' counterclaim. Herrin testi-
fied that Johnson insisted he surrender the $2,500 or
the stock, which Herrin refused to do.

On April 1, 1948, Herrin wrote to Johnson as presi-
dent of the lumber company and investment company

as follows: "I am giving you and your corporations this final opportunity to purchase my stock in the above named companies for the book value thereof, which makes a total of $18251.86 for all of my shares of stock. I shall also expect to receive from you and your company at once the balance due and owing to me for salary, which is $3000.00, whether I sell my stock to you or not. As far as your demand that I return by next Saturday the $2500.00 which I drew on my accumulated salary, this is to advise you that I shall not do so. * * * If I do not hear from you by next Saturday morning I shall publicly offer my stock for sale pursuant to the enclosed advertisement and proceed to collect the balance of my salary in a legal way."

The ad was not published. The stock was turned over to brokers to sell on the open market. It was not sold but delivered to the plaintiff who still possessed it at the time of trial.

Herrin further testified that at the close of the fiscal year 1946-1947, Johnson computed the book value of the stock in the lumber company to be $238 per share, and offered $11,000 for the stock, or offered to sell Herrin stock at $238 per share; and that on various occasions Johnson stated the value of the stock. On one occasion, March 1, 1948, Herrin called Johnson at his home when Herrin was ill, and Johnson told him he had nothing to worry about, that his stock was worth $15,000.

The secretary of the corporations testified that he was present with Johnson and Herrin when the stock was sold to Herrin. On that occasion Johnson stated the manner in which Herrin could acquire the stock, then said: " 'With the understanding that I would like this in writing, for in the event you ever decide to dispose of that stock you are to offer it to me first.' " Nothing was said that Johnson agreed to repurchase the stock, and he stated Herrin never told him that Johnson so agreed.

Harold Johnson testified that when Herrin came to

Hastings he and his brother were present. Herrin said: " 'I would like to straighten out my affairs with the company. * * * When I hired out to your brother, L. W. he agreed to give me a salary of three hundred dollars a month and a bonus * * *.' " Johnson said: " '* * * that is a damned lie, * * *' " and told him to get out. Later Herrin talked to this witness uptown. He said when he purchased this stock Johnson sold it to him under the condition that if he ever placed the stock for sale that it would be offered to Johnson first. This witness asked him if he had done this. He said he had not had a chance. Then he asked him why he did not. Herrin said he did not know what it was worth. This witness said: " 'Why don't you find out what it is worth, or consult someone you have confidence in to determine the value and offer it?' " He said he would. This witness further testified that at no time did Herrin tell him that Johnson agreed to repurchase the stock; that Herrin called him long distance at a later date and asked if he was interested in it or if his mother was, to which the witness replied that they were not.

Johnson testified to the stock transaction, in addition to what has been stated, as follows: That the secretary of the corporations informed him that there had been some talk about Herrin purchasing stock, and the witness, the secretary, and Herrin were together, and Johnson said that the matter of the purchase of stock was for Herrin to determine. The stock was purchased on the terms previously mentioned. He further testified that after the negotiations were completed he started for the door and turned around and said to Herrin: " '* * * there is one understanding I want, and that is in case you ever sell this stock you are to offer it to me first' and Harold said, 'Fine I will do that * * *.' " The witness turned away and walked out. Before doing so, he said to Herrin: " '* * * I suggest you write up a letter and drop it in the file that you will offer it to me in case you ever want to sell it.' " This witness denied that he

ever told Herrin he would repurchase the stock; that he ever discussed the family aspect of the corporations or partnership with Herrin; and that he had told Herrin the stock in the lumber company had a book value of $248, or that he would give him $11,000 for the stock.

The defendants contend the trial court erred (1) in finding and decreeing that an oral agreement was entered into by and between Lawrence W. Johnson, as president of the corporations, and the plaintiff to repurchase the stock held by the plaintiff in the corporations for the corporations in the event of plaintiff terminating his employment with the corporations at the book value of the stock at such time, and (2) in decreeing a specific performance of the alleged contract for the repurchase of the stock.

The Supreme Court, on appeal from a decree in an equity case, is required to consider and decide the case on the evidence without regard to the conclusions of the district court, but to the extent that there is an irreconcilable conflict of proof on any question of fact, this court will give due consideration to the fact that the district court saw the witnesses and their manner of testifying, and that it accepted one version of the facts. See Noetzelmann v. Noetzelmann, *ante* p. 133, 43 N. W. 2d 515.

Has plaintiff sustained the burden of proving an oral contract the terms of which are clear, satisfactory, and unequivocal; that is, does the evidence with clarity, satisfactorily, and unequivocally, or as unequivocally is defined, not doubtfully and not ambiguously but clearly, when all of its parts and the elements of a contract are taken into consideration, indicate the existence of a contract? If it does, then the requirements of the rule in this respect have been satisfied. The rule is not one of weight but of quality and substance of evidence. It means that when he has done this, in the absence of anything to the contrary, his burden in this respect has been sustained. If, however, its weight is brought into

question then before he shall be entitled to have his position sustained he, having the affirmative, must sustain it by a preponderance of the evidence. See Riley v. Riley, 150 Neb. 176, 33 N. W. 2d 525.

"Specific performance of a contract will not be decreed unless the minds of the parties to the contract have met. In order to establish a contract capable of specific enforcement it must be shown that there was a definite offer and an unconditional acceptance." Horn v. Stuckey, 146 Neb. 625, 20 N. W. 2d 692.

"Specific performance of an alleged contract will not be enforced unless the court can clearly see upon what proposition the minds of the parties have met in a common intention." Krum v. Chamberlain, 57 Neb. 220, 77 N. W. 665.

In Mercer v. Payne & Sons Co., 115 Neb. 420, 213 N. W. 813, this court held: "To entitle a party to specific performance, there must be a clear, mutual understanding and a positive assent on the part of each party. Mutuality of obligation is an essential element of the right to enforce specific performance of a contract in a court of equity." In the body of the opinion the court said: "* * * a court of equity will not enforce a contract, unless it is complete and certain in all its essential elements, and the parties themselves must agree upon the material and necessary details of the bargain, and if any of these be omitted, or left obscure or indefinite, so as to leave the intention of the parties uncertain respecting the substantial terms, the case is not one for specific performance. It is not the function of a court of equity to make a contract for the parties, or to supply any of the material stipulations thereof. If any of the essential details are wanting a chancellor will not supply them in a decree for specific performance." See, also, Zimmerman v. Rhoads, 226 Pa. 174, 75 A. 207.

We analyze the evidence in accordance with the foregoing authorities.

The evidence discloses that prior to the time of the in-

corporation, Herrin was desirous of purchasing stock in the corporations to be formed. He first wanted to invest $10,000 in the stock. It developed that he had a credit with the corporations in the amount of $6,600, and made the purchase of stock as heretofore set out, all of which was on his own initiative. At the time he purchased the stock and the deal for the purchase was closed, it is apparent that Herrin never relied on any statement or representation made by Johnson that Johnson would repurchase the stock in behalf of the corporations or himself individually on certain conditions. It is also apparent that it was not necessary to hold out to Herrin any inducement to persuade him to agree to purchase the stock. He at no time made any mention or put forth any proposition or arrangement as to what would occur in event of his death or termination of employment with the corporations. The matter with reference to repurchase arose after the sale of the stock had been consummated. Johnson made a request to Herrin to the effect that, in the event Herrin desired to offer the stock for sale, Johnson would like to have the first opportunity to purchase it before it was placed on the market. The letters written by Herrin to Johnson, although addressed to Johnson as the president of the corporations, disclose that Herrin felt he was only obligated to offer the stock to Johnson and if Johnson did not want to purchase the stock he would be free to place it on the open market. The fact that the corporations were a close family matter did not deter Herrin's interest in purchasing the stock. He voluntarily purchased it without any suggestion, and made no requirement that Johnson, on behalf of the corporation or as an individual, repurchase the stock. The most that can be gathered from the evidence is that Johnson requested Herrin, in the event he sold the stock, to give him the first opportunity to purchase it.

We conclude that the evidence fails to disclose a meeting of the minds of the parties to the alleged oral con-

tract to repurchase the corporate stock, and the plain-. tiff has failed to prove that such contract was clear, satisfactory, and unequivocal in its terms as is required before specific performance of the contract can be granted, as provided for by the authorities heretofore cited.

The trial court dismissed the action as to the defendants individually. Defendants contend this dismissal, unappealed from, does not vest this court with jurisdiction to determine whether or not an oral contract was entered into between the plaintiff and Johnson whereby Johnson agreed to repurchase the stock individually. The following authorities are applicable.

It is the practice of courts of equity, when they once have obtained jurisdiction of a case, to administer all the relief which the nature of the case and the facts demand, and to bring such relief down to the close of the litigation between the parties. See, First Trust Co. v. Airedale Ranch & Cattle Co., 136 Neb. 521, 286 N. W. 766; Best & Co., Inc. v. City of Omaha, 149 Neb. 868, 33 N. W. 2d 150.

Where a court of equity has obtained jurisdiction of a cause for any purpose it will retain it for all purposes, and will proceed to a final determination, adjudicate all matters in issue, and thus avoid unnecessary litigation. See Security Investment Co. v. Golz, 151 Neb. 172, 36 N. W. 2d 862.

We conclude the evidence fails to prove an oral agreement as required by law that Lawrence W. Johnson agreed to repurchase the stock in the corporations in the event of plaintiff terminating his services with the corporations.

With reference to the claim of Herrin for unpaid balance of salary, the record shows that Herrin at all times from the date of entering the employ of the co-partnership received a salary and a bonus which continued up to the time of incorporation of the partnership. At that time he had a bonus credit with the corporations which

he used to purchase stock in them. His income tax returns show that he paid taxes on salary and bonus. At the end of the fiscal year 1947, Herrin testified Johnson told him he would pay him $12,000 a year, $1,000 a month and no bonus. Beginning June 1, 1947, Herrin drew a salary of $450 a month, and that is the manner in which his salary was set up on the books. The balance was credited on the books. From June 1, 1947, to April 1, 1948, Herrin had drawn $450 a month. He also drew $2,500 in addition. This $2,500 item is the one the defendants contend he unlawfully withdrew and had no authority to do so, and is the amount sought to be recovered in defendants' counterclaim. This amount was withdrawn for the purpose of paying a note to a bank and income taxes.

The evidence shows that Herrin made withdrawals from the corporation without objection, and the denial of his authority to withdraw the $2,500 is not supported by the evidence. This was a credit he was entitled to, and there remained owing him for salary the amount for which the trial court rendered judgment.

The judgment of the trial court in granting the plaintiff the claim for salary due, dismissing defendant corporations' counterclaim, and dismissing the defendants as individuals is hereby affirmed. The judgment of the trial court holding that an oral contract was made by and between the plaintiff and the corporations for the repurchase of the corporate stock at book value upon the termination of employment by the plaintiff with the corporations is hereby reversed, and the trial court is directed to enter judgment in accordance with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.