IN RE DISSOLUTION AND WINDING UP OF KEYTRONICS,
FORMERLY KNOWN AS SECURE DATA SYSTEMS,
A NEBRASKA GENERAL PARTNERSHIP.
SCOTT WILLSON, APPELLANT, V. DON KING, APPELLEE.

744 N.W.2d 425

Filed February 1, 2008.    No. S-06-690.

Mitchel L. Greenwall, of Yeagley, Swanson & Murray, L.L.C., for appellant.

Bradley D. Holbrook, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## NATURE OF CASE

The issue in this case is whether a business partnership was formed between Don King and Scott Willson and, if so, what business activities were part of that partnership. The Uniform Partnership Act of 1998 (the Act),[1] at § 67-410(1), states that "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Willson brought an action for the winding up and an accounting, alleging formation of a partnership, and King counterclaimed for wrongfully withholding property, denying the partnership. The district court found that King and Willson had "pooled resources, money and labor," but found no partnership existed because there was no "specific agreement." Alternatively, the court found that because King did not commit his preexisting business to any specifically formed partnership, the scope of the partnership did not encompass any activity-garnering profits. Willson appealed the district court's order. We reverse, and remand for further proceedings.

## BACKGROUND

King and Willson first met sometime in 1999 when Willson, an electronics technician and computer programmer, was working at a computer store. King was doing business at that time under the name of "Washco," as a sole proprietorship, and King contracted with the store for a computer repair. Washco sold and installed carwash systems and accessories. It also serviced

---

[1] Neb. Rev. Stat. §§ 67-401 to 67-467 (Reissue 2003).

existing carwash systems and the systems it sold. Washco later became Wash Systems, Incorporated.

One of the products King offered to his customers was the "QuikPay" system. QuikPay is a cashless vending system for carwashes. Customers use a memory chip key that can be placed on their key chain and used with a controller at the carwash. Either a cash value can be placed on the key, or an account can be established through which carwash usage recorded on the key is billed monthly.

Washco purchased QuikPay systems for resale from Datakey Electronics Inc. (Datakey). Datakey's main line of business was the manufacture and sale of keys with reprogrammable memory and their corresponding "Keyceptacles" for a variety of applications. The QuikPay carwash system was only one such application, and it was becoming unprofitable for Datakey.

Part of the reason that the QuikPay system was unprofitable was that the keys for QuikPay could only be obtained from an attendant. If the key was set up for cash, when the credit ran out, the key could only be recharged through an attendant. Glen Jennings, president of Datakey, explained that since most carwashes are unattended, this reliance on the presence of the carwash owner or employee was limiting the product's market. The system needed some "peripherals" to make it self-service. Datakey had decided, however, not to dedicate its limited engineering resources to the design or manufacture of such "peripherals." It was looking into the possibility of working with an outside source as the original equipment manufacturer of such items.

As QuikPay's largest distributor, King was aware that QuikPay's limitations made the product unattractive to many of his customers. King was also having other problems with the system. In the spring of 2002, Willson was working at a new company as a computer programmer. King contacted Willson privately to see if Willson could develop a combined "key dispenser" and "revalue station" for the QuikPay system that would make the system self-service. King also asked Willson if he would design and install an interface between the QuikPay system and the carwash of one of King's customers. King explained that although most carwashes already contained a

third-party interface that would easily connect with the QuikPay system, a few did not. Without such an interface, King was unable to sell QuikPay to these customers. Designing such an interface was beyond King's technical expertise.

There is little evidence in the record as to what sort of business arrangement was made with regard to Willson's services in designing the interface. King states only that compensation "was never discussed," and, in fact, Willson was never paid for his work. It is undisputed that Willson individually designed and installed at least four specific customer interfaces that allowed King to sell the QuikPay system to those customers.

As to the development of the key dispenser-revalue station, King testified there was an oral agreement among himself, Willson, and Scott Gardeen. Gardeen was an employee of Datakey who was an original designer of QuikPay and was King's main contact with Datakey. According to King, they agreed they would form a corporation whenever Willson developed the key dispenser-revalue station. Gardeen also recalled discussing their business as a future corporation because they were concerned about personal liability issues inherent to partnerships. Willson, on the other hand, had no memory of specifically discussing the formalities of their business relationship. He was sure that they had agreed they would all "be a part of it" and that they "each had a piece of the pie."

The three parties met in Des Moines, Iowa, in the spring of 2002 to discuss the venture in which they would design and build the key dispenser-revalue station and sell it to Datakey. It was agreed that Willson would write the software and do the firmware, hardware, and any other electrical or software work; Gardeen would contribute his knowledge of the system and his contact with Datakey; and King would contribute financial resources and his experience and contacts as QuikPay's largest distributor.

Together, Willson, King, and Gardeen came up with the name "Secure Data Systems" for their business. They discussed the fact that the entity's initials, "SDS," were also the initials of their first names, Scott, Don, and Scott. By the summer, Willson had built a hand-held revalue station for a meeting with Jennings. Jennings indicated that if a

final, marketable key dispenser-revalue station were developed, Datakey would be interested in a business relationship with Secure Data Systems.

In the meantime, King was becoming increasingly frustrated with maintenance of the QuikPay system for his customers. In September 2002, King sent a letter to Gardeen complaining about various issues with the system. The main complaint was that controllers were not operating properly. Although Datakey provided King with replacement controllers, King had to drive long distances to his customers' sites to manually implement the replacement or make other repairs he had not anticipated. In the letter, King stated:

> I can not [sic] continue to expose my self [sic] to the expense of keeping this stuff running. Besides the expense I don't have the time. I don't see that I have any other choice but to back away from selling additional clients. At least until the current problems are stable or we have a new controller. I don't feel like I can honestly charge or pass expense's [sic] on to my customer when this product continues [to] have problems.

King then proposed:

> Because of [Willson's] future interests, I believe he would be more motivated to address issues with the current controller than a programmer with no interest in the system. [Willson] has mentioned that programming cost can exceed one hundred dollars an hour. If . . . Willson were to work on the current system I believe he should be compensated for his work. I would have to discuss it with . . . Willson, but I don't believe he would demand those kind[s] of fees.

King suggested that Datakey allow Willson access to its proprietary software.

King continued to involve Willson in dealing with other technical issues relating to King's QuikPay customers. Willson explained: "[T]here w[ere] a lot of problems with the QuikPay units. Sometimes they would put the wrong version of firmware on there or they wouldn't program for them at all and the units just wouldn't function properly." It became King's regular practice to copy Willson into his e-mail correspondence with

Datakey concerning QuikPay system maintenance. According to Willson, King and Willson communicated regularly about both the development of the key dispenser-revalue station and QuikPay maintenance. Willson testified that he did not demand or receive payment for these services, but believed they were part of his contribution to the partnership.

Around October 2002, Datakey decided to discontinue its QuikPay line. Its minimal sales of QuikPay were outweighed by Datakey's costs in addressing support issues for the product. To each of its customers, Datakey sent one controller for every two they had ever purchased, and informed them that Datakey would no longer be supporting their product.

Datakey referred all of its customers to King at Washco for continued support of the system. Datakey's customer base consisted of approximately 20 or 30 customers with a total of at least 200 QuikPay controllers in use. It is unclear how many QuikPay customers King had had prior to this time. Datakey also gave to King, without charge, all of the parts and equipment relating to QuikPay that Datakey had in stock. This inventory had an original procurement cost of approximately $200,000. Datakey had already given King and Willson access to its software source codes. Jennings explained, "[W]e were happy to have somebody who would give [QuikPay customers] best-efforts supports [sic], because obsoleting a product can reflect poorly on our name." In addition, Datakey hoped to be able to continue selling its keys and Keyceptacles to QuikPay customers, if those systems were kept "alive" by King.

Willson testified that from the moment King acquired Datakey's customers and inventory, Willson was very involved in making this acquisition a success. Willson testified that King immediately asked him to put together a list of things that they needed from Datakey to make all the inventory work. The record contains an e-mail from Willson to King with this list. In the e-mail, Willson also offered to accompany King to Minneapolis, Minnesota, to Datakey's headquarters if necessary and Willson stressed that they would need as much information as possible from Datakey "in order to make this a successful venture."

Willson explained that he was in charge of assembly and repairs of the QuikPay inventory once they received it. The inventory was shipped in pieces, and many of the old input/output, or I/O, boards had to be updated with the newest version of the QuikPay program so that the QuikPay units would function properly. Willson stated that his direct and indirect involvement in customer service for the QuikPay line also increased at this time.

Willson stated he was in frequent communication with King regarding the QuikPay acquisition from Datakey and the development of their new customer base. Willson said he discussed with King in detail what would be appropriate pricing for QuikPay repairs and equipment. The record contains evidence of an e-mail from King to Willson with the QuikPay pricing schedule. According to Willson, he and King discussed ways to minimize costs of the QuikPay units. For example, Willson stated that they jointly made the decision to discontinue about half of the QuikPay box styles previously available to customers so that they could cut down on Secure Data Systems' costs. Willson also stated that they discussed creating a new brochure to promote the QuikPay line to customers. "[B]etween helping customers and modifying boards and getting the units put together and tested so that [King] could sell those," Willson stated that when he had time, he also continued to work on developing the key dispenser-revalue station.

King testified that by the beginning of 2003, he had deliberately separated his QuikPay sales, maintenance, and its future development from his Washco carwash business and had moved all QuikPay business to Secure Data Systems. Around the same time, Willson developed a Web site for Secure Data Systems with e-mail accounts for King and Willson.

King continued to operate Washco as he had previously, selling and maintaining the non-QuikPay carwash systems and accessories. There is no allegation that Willson was ever involved in non-QuikPay Washco ventures.

King and Willson had difficulties with some of the inventory acquired from Datakey. The record contains a draft letter that King e-mailed to Willson, in which King expressed his frustration to Gardeen, who, as mentioned, was King's main liaison

with Datakey. Apparently in reference to himself and Willson, King repeatedly referred in the letter to "we" and "us." King stated that he would rather be writing a letter to Jennings thanking him for "the faith that he extended to us that we have the ability to make the QuikPay system work." But, the system had been "pieced mealed [sic]" to "us" and remained incomplete. King made several complaints and described some of the future challenges his acquisition would present:

> Regarding the [computer] software, because of licensing agreements, you told us that we had [to] go out and buy [a specific computer application]. We did and as you know it did not work. Now you are telling us that we are going to have to go out and buy [another computer application]. . . .
>
> . . . .
>
> You suggested that we get on with development of a new controller and write all new software. When the parts run out, end users will simply have to purchase new controllers and software. Development of a new controller and software will differently happen. . . .
>
> With the exception of the data back up problem in the [computer] software, the controller and firmware with the latest updates appear to be stable. On the other hand we have no idea what is going to surface down the road.

King reminded Gardeen that there were customers with substantial commitment to Datakey's key and that they "deserve better." King asked Datakey for more assistance and reiterated that "we are looking forward to a long and successful association with Datakey."

Jennings explained that when King took over the QuikPay system, Datakey had sent King compact discs with the source files and other information Datakey thought would be needed to support the system, but King was still having trouble getting things to run. Both Jennings and Gardeen testified that it was apparent that Willson was the person working with King to get the QuikPay equipment working. And there was substantial correspondence between Datakey and Willson regarding the QuikPay system. Eventually, Jennings sent an e-mail to Willson, copied to King, explaining that rather than trying to

figure out which file might still be missing from the compact discs sent to them, Datakey would simply rebuild the system on a computer and lend that computer to Willson as a reference tool. This was, in fact, done.

When Jennings was asked whether he knew who the owners of Secure Data Systems were, he answered that he "understood that . . . King and . . . Willson were involved in Secure Data Systems." Upon further questioning, Jennings testified, however, that it was "never clarified" whether both King and Willson owned Secure Data Systems or whether one worked for the other.

In May 2003, King and Willson went together to an international carwash convention in Las Vegas, Nevada. King suggested to Willson that he make up Secure Data Systems business cards for King and Willson. The cards presented Willson as "System Designer & Engineer" and King as "Sales." The cards described Secure Data Systems as carrying the "QuikPay Product Line." According to King, "you just simply don't go to a convention like that without a card telling people who you are." In an e-mail sent by Willson to King at the end of April, Willson asked King not to print up too many cards yet because the next month he was planning on having a second telephone line installed "specifically for Secure Data Systems so customers will have limited access to me as well," and he wished to add that number to his card.

After the Las Vegas trip, King and Willson had an argument about the Secure Data Systems Web site because Willson had made reference to a trademark name and logo on the site and King was concerned about legal liability. Willson stated that he became upset because of the way he felt he was being treated by King during the argument. After the argument, Willson sent an e-mail to King stating, "[R]egarding Secure Data Systems and our partnership, I have decided to take your suggestion and leave you in complete control and give you complete ownership." Both King and Willson testified, however, that they soon reconciled after this disagreement. They then continued with their relationship as before, apparently without King's ever objecting to Willson's characterization of their business relationship as a partnership, and himself as a co-owner.

By the spring of 2003, Willson explained that his work for Secure Data Systems consisted primarily of dealing with QuikPay maintenance and repair issues, although he continued to try to finish the key dispenser-revalue station whenever he had time. Willson made changes in the QuikPay software to fix some "annoy answers" and other problems that customers wanted fixed. Willson then placed the software "patch" on the Secure Data Systems' Web site for downloading by Secure Data Systems' customers. There were also firmware upgrades that had been designed by Datakey that had to be implemented. On one occasion, Willson had to recover data and repair a unit that had been struck by lightning.

Another maintenance job that Willson did was to continue to modify I/O boards. Willson explained that the "older style [of I/O boards] were burning out due to a transistor, a component of the board not being set up right." This particular modification had been designed by Datakey, and Willson only implemented it. By September, Secure Data Systems had hired another company to do the I/O board modifications because, as Willson explained, the boards took about 45 minutes each and there came to be too many of them.

Willson testified that King would call him regularly with any number of QuikPay maintenance problems. According to Willson, King was usually the direct contact with QuikPay customers. Willson would correct the issues during the evening and early morning hours and put the repair information onto the Secure Data Systems' Web site for King to look at the next morning. Willson stated that he also worked directly with QuikPay customers on occasion.

As early as June 2003, Willson had asked King to clarify what King thought Willson's priorities should be concerning his contribution to Secure Data Systems. King had asked Willson to deal with a customer complaint as to the failure of QuikPay's managing software to automatically record cash keys for accounting. In an e-mail to King, Willson explained that he would rewrite a portion of the software, but that these QuikPay maintenance issues were taking time away from developing the key dispenser-revalue station:

We need to get the vending machine completed, but I get mixed signals from you alot [sic] as to what you want to do. (ie. [sic] Vending machine, expresskey patch and now this). I realize that they are all important and need to be add[re]ssed and taken care of, but we need to stop moving back and forth, finish one and move on to the next as we talked about before. Drop me a line and let me know what you think we need to be focusing on.

King replied:

I don't intend to send mixed messages. I feel our priorities ha[ve] always been and should remain on the Revalue Station. We should follow up with a new controller, software and hand held read/writer. . . .

This issue with this customer in Columbus[, Nebraska,] is not the first time we have heard this complaint. It is however the first time we have had a customer complain this strongly about it. Issues like this and the complaints that brought about the software patch, etc., arise routinely in the course of the day to day activities of doing business. We can not [sic] ignore these issues. We have to deal with them in a manner that allows us to stay focused and still do the best we can to deal with the complaints. It may mean that we can only address a giv[en] issue with a band aid [sic] or on a temporary basis. If it [is] something that we can not [sic] provide we then have no other choice but to advise the customer as such. If it is something that is going to take a lot of time then we need to value the importance while keeping our priorities in mind.

I am going to continue to call you when these things come up. Again it is not by intention to change priorities. We need to discuss these issue[s], if we can do anything, the importance and how we want to handle what ever [sic] comes along.

The record contains 17 repair tickets dating from March to November 2003, totaling $4,150.77 in repairs done by Willson on QuikPay systems for various customers. King admits that either directly or indirectly, customers were billed off of these tickets that King obtained through the Secure Data Systems' Web site. Another bill is found in the record sent by King to

a client for $600.26 in controller repairs, which King told the client had been done by "Scott." At trial, Willson estimated that he had put at least 2,000 hours into QuikPay sales and maintenance and in developing the key dispenser-revalue station.

In correspondence with clients, King often referred to Willson as the person doing technical work for QuikPay. Willson also sent e-mails communicating directly with QuikPay clients on various issues. In an e-mail dated August 12, 2003, Willson describes himself as the software and hardware designer with Secure Data Systems and he refers to King as his "partner." The record contains correspondence between King and Willson discussing Secure Data Systems' purchases for QuikPay maintenance and development. In an e-mail from November 2003, King forwarded to Willson the price list for what he had been quoting customers for QuikPay repairs.

In October 2003, King sent an e-mail to a potential customer in which King referred to Willson as "the other half of Secure Data Systems." This potential customer had an old version of QuikPay, and King was trying to sell the owner updates that Willson, who "does all the programming," had made to the software and firmware. These updates, King explained, coupled with the necessary hardware updates, would resolve the owner's current complaints with his QuikPay system. King referred the customer to the Secure Data Systems' Web site for Willson's instructions as to how the owner should send his database in for updating.

Willson incurred out-of-pocket expenses in 2002, but those were apparently reimbursed by King. Willson stated that because these out-of-pocket expenses were relatively small, King had instructed him to make a list of those expenses so that King could claim them on his taxes and Willson would not have to worry about filing a special form. Willson was not aware that he was supposed to file a partnership tax form, and he never did so.

Again, in the first half of 2003, Willson testified that he incurred out-of-pocket expenses, and he stated that he did not always seek reimbursement for those expenses from King. It is undisputed that later that year, King gave Willson a credit card number and verification code so he could charge Secure Data

Systems' business to the card. It is unclear whether Willson believed the card was an official Secure Data Systems' card. It was, in fact, King's personal credit card that he had designated for Secure Data Systems' business. Willson used the card to purchase parts that he needed in working on QuikPay maintenance and in development of the key dispenser-revalue station. There is no evidence that Willson was required to get King's prior approval before incurring Secure Data Systems' related. expenses.

When Willson was asked why he invested his time and expertise into QuikPay without any remuneration, he explained, "That was my contribution to the company. I mean that was my piece." Willson claimed that King periodically kept Willson informed about how much money was in the bank that had accrued in profits derived from QuikPay sales and maintenance. Willson alleged that sometime in 2003, he and King discussed distributing some of the profits through draws or bonuses at the end of the year.

Still, Willson "started getting uneasy." Willson explained that he "wasn't feeling comfortable continuing to repair controllers [and] create a vending machine when the only reassurance I had was, don't worry, I'm not going to leave you hanging." Willson contacted a law firm to draw up papers to formalize the partnership. These papers were never drafted. According to Willson, when he told King he was looking into creating a written agreement for their relationship, King "assured [him] that he was having his attorneys look at it," and King asked for his and his wife's Social Security numbers. Willson's wife testified at trial that she remembered when King asked for their Social Security numbers.

At the same time that Willson was seeking more formal guarantees of his partnership interest, King was expressing his impatience with the fact that Willson had not yet produced a key dispenser-revalue station. Willson's wife explained that shortly before the meeting, King had come over to their house to pick up something that Willson had worked on for QuikPay over the lunch hour and that King had complained about Willson's "dedication." She explained:

> I was very upset because at that time I wanted [Willson] to take our son to preschool and he couldn't go because he had to finish whatever it was [King] had him working on, something with the QuikPay. And I asked [King] how could you question his — you know, he's doing all — everything you ask him to do. He does everything that needs to be done. I didn't know of any incomplete things. Every time he had a chance, he was talking to [King] or getting things done that needed to be done with QuikPay.
>
> He never told [King] no. He didn't ask for any money, and I didn't understand how [King] could question [Willson's] dedication.

King and Willson had a meeting with their wives to discuss their respective concerns. Apparently, their respective unease was at least temporarily resolved. Willson's wife described the meeting as follows:

> And they were mainly focused on where they were going, the revalue station was their key. That's what they wanted to do. And [King] kept staying [sic], well, we have to make our customers happy. We have to get the QuikPay working. If that doesn't work, then you know the revalue station is — you know, he said we had to make our customers happy. And so he was telling [Willson] this as we were sitting at [a restaurant], and I thought the meeting went well. We had talked again about officers or I don't know how the business works. I was just trusting that [Willson] would let me know.

On cross-examination, Willson's wife clarified that when King was discussing keeping customers happy, he was referring to the existing QuikPay system and not the key dispenser-revalue station Willson was trying to develop. Willson similarly testified that at the meeting, they discussed "officers or something like that. For a corporation, I don't really understand all how that works, but at that time I felt at ease."

During this general time period, King discovered that the name "Secure Data Systems" had already been taken for incorporation and this was discussed with Willson. The name "KeyTronics" was suggested by Willson's wife. In December 2003, Willson developed a new Web site for "KeyTronics." Willson then

moved over the "service tracker" program and other information from the previous Secure Data Systems' Web site to the new Web site for "KeyTronics."

The record contains an e-mail dated December 13, 2003, in which King tells Willson that he had to cancel the "Secure Data [credit] Card" in order to get the name on the card changed to "KeyTronics." Willson sent King a list of his understanding of what the current objectives were for "KeyTronics." This list included completing projects relating to the development of the key dispenser-revalue station as well as certain goals relating to sales, inventory, and repairs for the existing QuikPay system. Willson testified that he was still optimistic about getting a key vending machine finished but that his relationship with King was deteriorating. Willson testified that "[w]e were arguing more, and nothing was getting done as far as paperwork."

King and Willson had another meeting around the end of December and agreed to end their relationship and any joint QuikPay or key dispenser-revalue station activities. Approximately 2 weeks after this meeting, King called Willson and offered to compensate him for the time he had spent in maintaining or repairing QuikPay. Willson refused and brought this action instead.

The record indicates King currently conducts QuikPay business under "Key-Tronics, Inc.," which is registered in King's name alone. Its sole line of business is the QuikPay system. King pays two independent contractors to assist him in installation, troubleshooting, and repairs.

King generally denied at trial any partnership relationship with Willson. King minimized Willson's assistance with regular QuikPay business and pointed out that Willson was never able to produce a marketable key dispenser-revalue station. King conceded that Willson had repaired 40 individual QuikPay controllers. He also noted that Willson had looked into some "glitches" in QuikPay's software package and had worked on an "LCD design" to go with the QuikPay controller. King indicated that Willson had worked on some I/O boards. Still, King could not believe that Willson had invested 2,000 hours in QuikPay or the key dispenser-revalue station, explaining, "[Willson] played softball, went out and helped his dad two nights a week, took

Japanese lessons. I truly don't know where you would come up with those kind of hours, the activity that he was doing."

King denied any agreement to share profits and equally denied any agreement to compensate Willson as an employee or independent contractor. King presented no explanation as to why, without any promise of remuneration, Willson contributed to King's QuikPay profits. King simply stated that the QuikPay business was solely his. He was distributing and maintaining QuikPay before he met Willson, and he asserted that the acquisition of Datakey customers and inventory did not significantly alter his business.

King did not recall asking for either Willson's or Willson's wife's Social Security number. He did vaguely admit to, at some point, telling Willson or his wife that he had spoken with an attorney about incorporating. King generally denied consulting with Willson about pricing for QuikPay or otherwise sharing in control of the QuikPay business. King emphasized that any work Willson did, which, again, he considered minimal, was always at King's request.

In its order, the district court, as the trier of fact, concluded: "[T]he evidence indicates that Willson and King pooled resources, money and labor." But, "the parties never entered into any specific agreement which would establish a partnership." Even if a partnership had been established, however, the court concluded that there would be no profits from the joint venture because "nothing in the evidence reflects that [King] ever committed his existing business and its related assets to the development efforts for the key system."

## ASSIGNMENTS OF ERROR

Willson assigns that the district court erred in (1) finding that there was no partnership under Nebraska law and (2) finding that no dissolution and accounting were necessary.

## STANDARD OF REVIEW

In considering the proper standard of review for the question of the existence of a partnership, we apply the standard

of review generally applicable to the underlying action.[2] An action for the dissolution of a partnership and an accounting between partners is one in equity. As such, in this case, the trial court's determination as to whether a partnership was established is reviewed de novo on the record.[3]

## ANALYSIS

This case is governed by the Act which was adopted after the passage of the revised Uniform Partnership Act.[4] Section 67-410(1) of the Act defines that a partnership is formed by "the association of two or more persons to carry on as co-owners a business for profit" and explains that this is true "whether or not the persons intend to form a partnership."

█ Obviously, the relationship between King and Willson is "of two or more persons." In addition, whether the business of QuikPay maintenance, or even the development of the never-produced key dispenser-revalue station, qualifies as a business "for profit" is not in issue. It is not essential that the business for which the association was formed ever actually be carried on, let alone that it earn a profit. Rather, a business qualifies under the "business for profit" element of § 67-410(1) so long as the parties intended to carry on a business with the expectation of profits.[5]

Still, Willson admits he is not pursuing an action for an accounting of a partnership that would be limited to the development of a key dispenser-revalue station. That product was

---

[2] See, *Lewis v. Gallemore*, 173 Neb. 211, 113 N.W.2d 54 (1962). Cf. *South Sioux City Star v. Edwards*, 218 Neb. 487, 357 N.W.2d 178 (1984). See, also, *Pennfield Oil Co. v. Winstrom*, 272 Neb. 219, 720 N.W.2d 886 (2006); *Gast v. Peters*, 267 Neb. 18, 671 N.W.2d 758 (2003); *Bass v. Dalton*, 213 Neb. 360, 329 N.W.2d 115 (1983); *Byram v. Thompson*, 154 Neb. 756, 49 N.W.2d 628 (1951).

[3] See, e.g., *Lewis v. Gallemore, supra* note 2.

[4] Unif. Partnership Act (1997) § 101 et seq., 6 U.L.A. 58 et seq. (2001).

[5] See, *Thompson v. McCormick*, 149 Colo. 465, 370 P.2d 442 (1962). See, also, 1 Alan R. Bromberg & Larry E. Ribstein, Bromberg and Ribstein on Partnership § 2.06(c) (2007); J. William Callison & Maureen A. Sullivan, Partnership Law and Practice, General and Limited Partnerships, § 5:10 (2006).

never produced and did not independently garner any profits to account for. We are instead asked to determine whether King and Willson were partners in an enterprise that involved both the development of the key dispenser-revalue station and the sales and maintenance of the regular QuikPay line. If so, Wilson claims that King must account to Willson for any profits relating to all QuikPay business.

The elements disputed by the parties are whether there was an "association" formed for QuikPay business, and whether such association, if created, was as "co-owners." The existence of a partnership is a question of fact under the evidence.[6] Because this is an action for an accounting, which lies in equity, we conduct our review de novo on the record, reaching a conclusion independent of the findings of the trial court.

### BURDEN OF PROOF

■ The burden of establishing the partnership is upon the party asserting that such a relationship exists.[7] We have said that where the plaintiff is alleging a partnership with the defendant, which the defendant denies, the plaintiff must establish the existence of the partnership by clear and convincing evidence. In contrast, where a third party to the alleged partnership has brought the action, the third party need only prove the existence of a partnership by a preponderance of the evidence.[8] Thus, we have required more convincing evidence to prove the existence of a partnership where the alleged partners are the only litigants than where the controversy is between a third party and the partners.[9]

In *In re Estate of Wells*,[10] we were not presented with a controversy between a third party and the partners. Furthermore, the plaintiff in that case was one of the alleged partners. Yet, we held that the plaintiff's burden of proof to establish the partnership was by a preponderance of the evidence. We found this lower

---

[6] *In re Estate of Wells*, 221 Neb. 741, 380 N.W.2d 615 (1986).

[7] *Id.*; *Johnson v. Graf*, 162 Neb. 396, 75 N.W.2d 916 (1956).

[8] See *In re Estate of Wells, supra* note 6.

[9] See, e.g., *Johnson v. Graf, supra* note 7.

[10] *In re Estate of Wells, supra* note 6.

standard of proof applicable because the other alleged partner was deceased and the action was against the State contesting inheritance taxes. As such, we characterized the plaintiff's action as falling under the third-party rule.

■ We have never explained, nor is there any reasoning to support, the confusing myriad of standards we have applied to what is, effectively, the same legal issue. Thus, we believe that the tenuous distinction between actions by alleged partners inter sese and actions by a third party against the alleged partnership should be abolished. In civil actions, a preponderance of the evidence is generally all that is required to sustain the claim of a party.[11] Exceptions to this standard for civil actions are uncommon[12] and are generally reserved for cases "where particularly important individual interests or rights are at stake," such as termination of parental rights, involuntary commitment, and deportation.[13] While a preponderance of the evidence standard allows "both parties to 'share the risk of error in roughly equal fashion.' . . . Any other standard expresses a preference for one side's interests."[14]

Generally, in both law and equity, proof of alleged contracts between the parties need only be shown by a preponderance of the evidence.[15] We see no reason to hold out a special standard for partnership relations that favors the party denying the relationship over the party asserting that the partnership exists. And the logic behind imposing a higher burden of proof in actions between alleged partners as opposed to actions by third parties against an alleged partnership has never been fully articulated.

---

[11] *State v. Neimer,* 147 Neb. 284, 23 N.W.2d 81 (1946). See, also, *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (superseded on other grounds by Civil Rights Act of 1991).

[12] *Price Waterhouse v. Hopkins, supra* note 11.

[13] *Herman & MacLean v. Huddleston,* 459 U.S. 375, 389, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983).

[14] *Id.,* 459 U.S. at 390.

[15] See, e.g., *Lewis v. Poduska,* 240 Neb. 312, 481 N.W.2d 898 (1992); *Hersch Buildings, Inc. v. Steinbrecher,* 198 Neb. 486, 253 N.W.2d 310 (1977); *Dunbier v. Rafert,* 170 Neb. 570, 103 N.W.2d 814 (1960); *Herrin v. Johnson Cashway Lumber Co.,* 153 Neb. 693, 46 N.W.2d 111 (1951).

By eliminating any common-law distinctions as to the burden of proof between actions alleging a partnership inter sese and actions by third parties, we bring greater predictability and consistency to partnership determinations.

In our de novo review, we thus determine whether Willson established by a preponderance of the evidence that he and King were partners in a business that entailed both the development of the key dispenser-revalue station and regular QuikPay sales and maintenance.

## ASSOCIATION

We first consider whether King and Willson formed an association. King correctly points out that inherent to the term "association" is the idea that the relationship between the "two or more persons" be intentional.[16] King argues that no partnership was formed because he never intended to form a partnership relationship with Willson. "In the domain of private law the term association necessarily involves the idea that the association is voluntary."[17] It is perhaps for this reason that the district court found it significant that King and Willson "never entered into any specific agreement which would establish a partnership."

But, as § 67-410(1) explicitly states, the intent necessary to form an association does not refer to the intent to form a partnership per se. There is no requirement that the parties have a "specific agreement" in order to form a partnership. People do not become partners when they attain co-ownership of a business for profit through an involuntary act.[18] But, if the parties' voluntary actions form a relationship in which they carry on as co-owners of a business for profit, then "they may inadvertently create a partnership despite their expressed subjective intention not to do so."[19] Intent, in such cases, is still of prime concern,

---

[16] See Bromberg & Ribstein, *supra* note 5, § 2.05(a).

[17] Unif. Partnership Act (1914) § 6, comment 1(1), 6 U.L.A. 394 (2001).

[18] Bromberg & Ribstein, *supra* note 5, § 2.05(a).

[19] Unif. Partnership Act (1997) § 202(a), *supra* note 4, comment 1 at 93. See, also, *Bass v. Bass*, 814 S.W.2d 38 (Tenn. 1991); 59A Am. Jur. 2d *Partnership* § 139 (2003).

but it will be ascertained objectively, rather than subjectively, from all the evidence and circumstances.[20]

Because of this, King's focus on his intent to form a corporation, as opposed to a partnership, does more to prove an intent to form the requisite association than to disprove it. It is, in fact, not unusual for courts to find a partnership relationship between parties that were operating with the intent to form a corporation and to specifically avoid a partnership relationship.[21] Even where a corporation has successfully been formed, courts have found a partnership relationship between the shareholders when the corporation is a mere agency for convenience in carrying out the joint venture or partnership.[22]

In *Hauke v. Frey*,[23] we found sufficient evidence of a partnership relationship between two parties who admittedly had once intended to form a corporation, but had never done so. The plaintiff in *Hauke* was the sole titleholder of the business property, which operated as a bowling alley, and he claimed he had no partnership with the defendant who was allegedly in wrongful possession of his property. According to the plaintiff, the defendant was merely an employee who managed the business in return for a set monthly wage. While the receipt of payment for services could be interpreted against a partnership relationship, there was also evidence that the defendant had purchased some equipment for the business and that the defendant was a mandatory signatory on a partnership bank account used for business expenses. We concluded although there was not an agreement containing complete details either of organization or of functions after organization, the conduct of the parties

---

[20] See, *In re Estate of Wells, supra* note 6; *South Sioux City Star v. Edwards, supra* note 2.

[21] See, e.g., *Wine Packing Corp. of Cal. v. Voss*, 37 Cal. App. 2d 528, 100 P.2d 325 (1940).

[22] *Arditi v. Dubitzky*, 354 F.2d 483 (2d Cir. 1965); *Bartomeli v. Bartomeli*, 65 Conn. App. 408, 783 A.2d 1050 (2001); *Koestner v. Wease & Koestner Jewelers*, 63 Ill. App. 3d 1047, 381 N.E.2d 11, 21 Ill. Dec. 76 (1978); *Elsbach v. Mulligan*, 58 Cal. App. 2d 354, 136 P.2d 651 (1943).

[23] *Hauke v. Frey*, 167 Neb. 398, 93 N.W.2d 183 (1958).

implied a partnership that was to continue until a corporation could be organized to take its place.

In considering the parties' intent to form an association, it is generally considered relevant how the parties characterize their relationship or how they have previously referred to one another.[24] The joint use of a business name is evidence of an association.[25] This is especially true when the business name is composed of the parties' names or initials.[26]

It is undisputed that King and Willson discussed the fact that Secure Data Systems had the initials of Scott, Don, and Scott. Granted, at its inception, Secure Data Systems was an association among three parties focused on the limited task of creating a key dispenser-revalue station. But, despite King's claim that the acquisition of all of Datakey's QuikPay inventory and customer base was insignificant, after this occurred, King removed any QuikPay operations from his Washco business. He instead began to conduct all QuikPay business exclusively through Secure Data Systems. Willson was clearly associated with King in that venture.

At that point, in e-mail correspondence with Datakey in regard to various complaints with the QuikPay system, King no longer referred to himself in the first person singular, but instead in first person plural, as "us" or "we." Business cards were created for King and Willson describing their respective positions in Secure Data Systems. King and Willson went as joint representatives of Secure Data Systems to a Las Vegas carwash convention. King and Willson worked together both in servicing the QuikPay line, assembling and repairing Datakey's old inventory, and developing the key dispenser-revalue station. Various e-mails to customers and to Datakey evidence their joint efforts in this regard. To King and to others, Willson

---

[24] *Mardanlou v. Ghaffarian*, 135 P.3d 904 (Utah App. 2006).

[25] See, e.g., *Van Dyke v. Bixby*, 388 Mass. 663, 448 N.E.2d 353 (1983); *Beck v. Indiana Surveying Co.*, 429 N.E.2d 264 (Ind. App. 1981).

[26] See, e.g., *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163 (Tex. 2007); *Landise v. Mauro*, 725 A.2d 445 (D.C. 1998); *Grissum v. Reesman*, 505 S.W.2d 81 (Mo. 1974); *Asamen v. Thompson*, 55 Cal. App. 2d 661, 131 P.2d 841 (1942).

referred to himself and King as partners. Specifically in regard to ventures involving the regular QuikPay system, King referred to Willson as "the other half of Secure Data Systems." We believe the evidence is clear that King and Willson formally associated to develop a key dispenser-revalue station and that further, this association expanded in scope to encompass all QuikPay operations.

### Co-ownership

Still, King asserts that any reference he made to Willson as the "other half of Secure Data Systems" was an insignificant figure of speech. Most importantly, according to King, there was no partnership because Willson never had co-ownership of the QuikPay business. King claims that he started selling and maintaining QuikPay by himself and asserts that he maintained full control of that business line. According to King, Willson simply did what King asked him to—apparently for free.

Being "co-owners" of a business for profit does not refer to the co-ownership of property,[27] but to the co-ownership of the business intended to garner profits. It is co-ownership that distinguishes partnerships from other commercial relationships such as creditor and debtor, employer and employee, franchisor and franchisee, and landlord and tenant.[28] Co-ownership generally addresses whether the parties share the benefits, risks, and management of the enterprise such that (1) they subjectively view themselves as members of the business rather than as outsiders contracting with it and (2) they are in a better position than others dealing with the firm to monitor and obtain information about the business.[29]

The objective indicia of co-ownership are commonly considered to be: (1) profit sharing, (2) control sharing, (3) loss sharing, (4) contribution, and (5) co-ownership of property.[30] The five indicia of co-ownership are only that; they are not all necessary to establish a partnership relationship, and no single

---

[27] See, § 67-410(3); 59A Am. Jur. 2d, *supra* note 19, § 140.

[28] See Callison & Sullivan, *supra* note 5, § 5:11.

[29] Bromberg & Ribstein, *supra* note 5, § 2.14.

[30] *Id.*; Callison & Sullivan, *supra* note 5, § 5:11.

indicium of co-ownership is either necessary or sufficient to prove co-ownership.[31]

The district court found that King and Willson had "pooled resources, money and labor." This is significant evidence of contribution. The record demonstrates that Willson contributed his time and expertise not only to the business of developing the key dispenser-revalue station, but also to the continued operations of the regular QuikPay product line. And even if Willson had not more directly contributed to regular QuikPay business, we again note that the business of QuikPay and the business of developing a peripheral product that would ensure QuikPay's continued viability in the marketplace were inextricably commingled. This was especially true with regard to Willson's contribution when King emphasized that Willson had to help keep the QuikPay system running because, otherwise, the development of the key dispenser-revalue station would lose its customer base and become irrelevant.

The continuing investment of one's labor without pay is generally considered a strong indicator of co-ownership.[32] It is evidence that, as Willson testified he explicitly understood, the party is not an outsider contracting with the business.[33] Valid consideration for an ownership interest in a partnership may take the form of either property, capital, labor, or skill, and the law does not exalt one type of contribution over another.[34]

In this case, Willson contributed his time and expertise without any compensation for approximately 1 year. Conservatively, Willson estimated his contribution as totaling over 2,000 hours. King did not present evidence of how many hours he had spent in the QuikPay venture. But more importantly, we conclude on our review of the record that without Willson's technical

---

[31] See Bromberg & Ribstein, *supra* note 5, § 2.07(a).

[32] See, e.g., *Schymanski v. Conventz*, 674 P.2d 281 (Alaska 1983); *Huffman Technical Drilling, Inc. v. Smith*, 424 So. 2d 435 (La. App. 1982).

[33] Bromberg & Ribstein, *supra* note 5, § 2.07(c).

[34] *Kennedy v. Miller*, 221 Ill. App. 3d 513, 582 N.E.2d 200, 163 Ill. Dec. 934 (1991); *South Sioux City Star v. Edwards, supra* note 2; *Cutler v. Bowen*, 543 P.2d 1349 (Utah 1975); *Chaiken v. Employment Security Commission*, 274 A.2d 707 (Del. Super. 1971); 59A Am. Jur. 2d, *supra* note 19, § 95.

assistance, King would have been unable to continue QuikPay's viability after Datakey abandoned the product. That King could have dealt with certain issues by hiring contractors or employees is irrelevant. He chose not to do so—presumably because the promise of the key dispenser-revalue station made a partnership relationship more worthwhile—and saved himself the expense of paying for this labor.

We also find that despite King's protestations to the contrary, the evidence shows that King and Willson shared control over QuikPay business. We note that control is "elusive because of the many gradations of control and because partners often delegate decision-making power."[35] Still, Willson testified that he and King consulted with each other over what appropriate pricing would be as they picked up Datakey's equipment and customers. This is evidenced by an e-mail of the price list that King sent to Willson. Under King's theory of the case, the e-mail would have been completely unnecessary, because according to King, Willson contributed very little and had no direct contact with customers or their billing.

Willson testified that he and King made joint decisions to cut certain costs. Willson set up the invoice system they used to bill QuikPay customers, and there is no indication that such a system was anything other than that of Willson's independent initiative and design. Willson made technical decisions on how best to assemble, repair, or maintain various aspects of the QuikPay system. The June 2003 e-mail written by King illustrates King's understanding that he and Willson would jointly address QuikPay customer issues as they arose and jointly evaluate Secure Data Systems' priorities as they went along.

Willson also testified that he had an agreement with King to share profits, although King denies this. Of the five indicia of co-ownership, profit sharing is possibly the most important, and the presence of profit sharing is singled out in § 67-410(3)(c) as creating a rebuttable presumption of a partnership.[36] However, what is essential to a partnership is not that profits actually be

---

[35] Bromberg & Ribstein, *supra* note 5, § 2.07(a) at 2:79.

[36] See, also, *Farmers & Merchants Bank v. Grams*, 250 Neb. 191, 548 N.W.2d 764 (1996); *Frisch v. Svoboda*, 182 Neb. 825, 157 N.W.2d 774 (1968).

distributed, but, instead, that there be an interest in the profits.[37] Willson's testimony that they agreed to share in the profits of the business is, in light of all the evidence, simply more credible than King's statement that compensation "was never discussed." And even King vaguely admits that they had an understanding to share profits of the key dispenser-revalue station, if that were developed. It seems reasonable to assume that this same understanding would apply to Willson as his participation and the scope of the venture expanded to encompass all QuikPay business.

We do not find any evidence that King and Willson had an agreement for loss sharing. But we find this of little import, since purported partners, expecting profits, often do not have any explicit understanding regarding loss sharing.[38] Likewise, although King and Willson admittedly do not own any joint property, in an informal relationship, the parties may intend co-ownership of property but fail to attend to the formalities of title.[39] Moreover, in this case, it is unclear that there is much QuikPay "property" at all. Certainly, as King's counterclaim alleged, Willson has possession of some QuikPay equipment. To the extent that a bank account is property, we note that although Willson had delegated financial matters to King and was not a signatory to the bank account where Secure Data Systems' revenues were deposited, Willson testified that King did keep him abreast of the financial status of that account. Willson believed he had an ownership interest in the funds in that account.

We conclude that the objective, as well as subjective, indicia are sufficient to prove co-ownership of the business of selling, maintaining, and developing QuikPay. Having already concluded that there was an association for the same, we conclude that Willson proved that he and King had formed a partnership for the business of selling, maintaining, and developing QuikPay.

---

[37] See, Bromberg & Ribstein, *supra* note 5, §§ 2.06(c) and 2.07(b); Callison & Sullivan, *supra* note 5, § 5:10.

[38] See Bromberg & Ribstein, *supra* note 5, § 2.07(d).

[39] Bromberg & Ribstein, *supra* note 5, § 2.07(f).

## CONCLUSION

Because Willson has proved a partnership relationship with King, he is entitled to a winding up and an accounting in accordance with the Act. The district court erred in concluding otherwise. Accordingly, we reverse the decision and remand the cause for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.