Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/26/2018 10:14 AM CDT

Fredericks Peebles & Morgan LLP, appellee,
v. Fred Assam, appellant.
___ N.W.2d ___

Filed August 3, 2018.    No. S-16-855.

1. **Declaratory Judgments.** An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute.
2. **Partnerships: Accounting: Appeal and Error.** An action for a partnership dissolution and accounting between partners is one in equity and is reviewed de novo on the record.
3. **Declaratory Judgments: Equity: Appeal and Error.** In reviewing an equity action for a declaratory judgment, an appellate court tries factual issues de novo on the record and reaches a conclusion independent of the findings of the trial court, subject to the rule that where credible evidence is in conflict on material issues of fact, the reviewing court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.
4. **Partnerships.** The interpretation of a partnership agreement presents a question of law.
5. **Appeal and Error.** An appellate court independently reviews a lower court's rulings on questions of law.
6. **Courts: Jurisdiction: States.** In answering any choice-of-law question, a court first asks whether there is any real conflict between the laws of the states.
7. **Jurisdiction: States.** An actual conflict exists when a legal issue is resolved differently under the law of two states.
8. **Contracts.** A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.
9. **Actions: Appeal and Error.** An appellate court determines the nature of an action from the relief sought.

10. **Breach of Contract: Damages.** A suit for damages arising from breach of a contract presents an action at law.

11. **Trial: Expert Witnesses.** The trier of fact is not bound to accept expert opinion testimony.

12. **Trial: Evidence.** Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence.

13. **Witnesses: Testimony.** The credibility of a witness is a question for the trier of fact, and it is within its province to credit the whole of the witness' testimony, or any part of it, which seemed to it to be convincing, and reject so much of it as in its judgment is not entitled to credit.

14. **Options to Buy or Sell: Valuation: Words and Phrases.** "Fair market value" is the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under compulsion to buy or to sell.

15. **Options to Buy or Sell: Presumptions.** The willing buyer-willing seller rule presumes that a potential transaction is to be analyzed from the viewpoint of a hypothetical buyer whose only goal is to maximize his or her advantage.

16. **Options to Buy or Sell.** The willing buyer-willing seller rule is applied using the viewpoint of an objective hypothetical buyer, rather than a subjective buyer.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellant.

Daniel P. Chesire, Brian J. Brislen, and Cathy S. Trent-Vilim, of Lamson, Dugan & Murray, L.L.P., and James J. Banks, of Banks & Watson, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Funke, J.

This appeal concerns a determination of Fred Assam's ownership interest in the law firm of Fredericks Peebles & Morgan LLP (FPM). After Assam voluntarily withdrew from

the firm, FPM filed suit seeking a declaration of the rights of FPM and Assam under the governing partnership agreement (Partnership Agreement). Following a bench trial, the district court for Douglas County declared the fair market value of Assam's interest in FPM to be $590,000. For the reasons stated herein, we affirm.

## I. BACKGROUND

### 1. PARTNERSHIP

FPM is a limited liability partnership composed of legal professionals. FPM has a nationwide practice which specializes in handling legal issues impacting Native American tribes, including, but not limited to, facilitating interrelationships between Native American tribes and the federal government, state governments, and other tribes, as well as foreign governments and foreign companies. FPM represents Native American tribes, entities, and individuals, as well as banks and financial institutions which deal with Native American tribes.

FPM was organized under the laws of the District of Columbia, and its principal place of business is located in Omaha, Nebraska. At the relevant time, FPM had dozens of attorneys throughout offices in Sacramento, California; Louisville, Colorado; Sioux Falls, South Dakota; Omaha, Nebraska; Winnebago, Nebraska; Peshawbestown, Michigan; and Washington, D.C.

As of October 1, 2014, FPM had five equity partners: Thomas W. Fredericks, John M. Peebles, Lance G. Morgan, Conly J. Schulte, and Assam. Fredericks, Peebles, Schulte, and Assam each held a 23.25 percent interest in FPM, and Morgan held the remaining 7 percent. FPM traditionally implemented a team approach in servicing its clients' accounts, but nearly 90 percent of FPM's clients were brought in by Fredericks, Peebles, Morgan, and Schulte. Assam, a financial attorney, worked on accounts brought in by the other equity partners. Only three clients followed Assam when he left FPM, two of which maintained a relationship with FPM.

In early 2014, FPM undertook a thorough financial review in order to implement long-term planning. The partners began to discuss changes to their compensation structure in order to reward younger partners for bringing in new clients. Fredericks proposed that compensation should be based on client generation, while others proposed that compensation should be based upon equity ownership. The partners exchanged and refined proposals over a period of months, and FPM ultimately arrived at a hybrid of the two compensation structures.

According to the testimony of Peebles, Assam had not kept up to date on the various proposals and voiced concern about only Fredericks' initial proposal, which Assam felt negatively impacted his compensation. As a result of his concerns, Assam hired the accounting firm Eide Bailly LLP to perform a valuation of his equity interest in FPM.

On the evening of October 2, 2014, Assam sent an email to his partners in which he voluntarily resigned from FPM. In the email, Assam advised, "As you are all aware, over the course of the last few months, I have been under a personal attack by . . . Fredericks." Assam stated the compensation structure Fredericks had proposed would "transfer complete control of [FPM] over to [Fredericks]. This means the life of my family and me will [sic] in complete control of a man who does not care for me and, in fact, will apparently act with intent to only to [sic] harm me."

The following morning, Assam, whose office is located in Sioux Falls, flew to Denver, Colorado, to attend a partner meeting at the Louisville office, which had been scheduled prior to Assam's resignation email. During his flight, Assam reviewed some of the more recent compensation structure proposals and realized the documents he had relied on when deciding to resign had significantly changed. At the meeting, Assam told the partners he had made a mistake and wanted to rescind his resignation and rejoin FPM. The partners declined and formally voted to accept Assam's resignation.

The FPM partners then continued their meeting and, as part of their ongoing financial review, addressed the agenda item of how to treat approximately $10 million in old accounts receivable. Many of FPM's clients are sovereign under federal law and therefore may not be sued to collect on past-due billing absent a waiver of sovereign immunity. FPM has a practice of not requesting such a waiver from its clients so as to not jeopardize client relationships. As a result, according to the testimony of Morgan, FPM has a lower-than-average collection rate.

FPM carried a significant amount of outstanding accounts receivable for an extended period of time. At the partnership meeting, FPM decided to write off as uncollectable approximately $10 million in old accounts receivable.

After Assam's resignation, the partners made him an offer of payment intended to represent the fair market value of his equity interest as set out in the Partnership Agreement. However, the two sides could not agree as to the value of Assam's interest.

In late 2014, FPM filed a declaratory judgment action to determine the value of Assam's interest. Assam filed an answer and counterclaim for an accounting and fair valuation of his interest in FPM, based on the Partnership Agreement. Assam sought a money judgment and attorney fees. FPM filed an amended complaint which asserted claims for breach of contract, breach of fiduciary duty, fraud, constructive fraud, rescission, disgorgement, and an accounting. Assam filed an answer which denied such claims and stated affirmative defenses.

At trial, FPM moved without objection to conform its pleadings to the adduced evidence in order to clarify that its sole claim was for declaratory judgment as to the amount it owed Assam for the fair market value of his ownership interest, as provided under the Partnership Agreement. Assam clarified that he maintained his counterclaim for an accounting, fair valuation, and a money judgment, plus attorney fees.

The Partnership Agreement is dated May 1, 2007, and was signed by Fredericks, Peebles, Morgan, Schulte, and Assam on August 9, 2008. The parties agree that the provision which governs the determination of Assam's equitable interest in FPM is:

> In the event any Equity Partner gives a notice of voluntary withdrawal more than sixty months of **July 1, 2003**, such withdrawing Equity Partner will receive an amount equal to 100% of the fair market value of the Equity Partner's interest in the Partnership as of the date of such notice of voluntary withdrawal, which amount will be paid out in six equal monthly installments without interest.

### 2. EXPERT TESTIMONY

The court heard valuation testimony from several expert witnesses. FPM called William Brennan, a management consultant for the legal profession. Assam called Chad Flanagan and Jay Fullerton, of Eide Bailly. In addition, Assam called Matthew Stadler as an expert witness. Assam himself also opined as to valuation.

### (a) Brennan

Brennan has worked for over a decade as a principal with a law firm management consulting group. He testified that in the past 25 years, he has consulted with over 500 firms of all types and sizes. Prior to becoming a management consultant, Brennan worked as an accountant and auditor. Brennan's work experience includes serving as chief financial officer and executive director for two law firms, one of which had 250 attorneys.

As a consultant, Brennan developed a specialty in law firm mergers and acquisitions, which included performing firm valuations. Over his career, he had performed about 25 firm valuations. He previously testified in court seven times as an expert in law firm valuation. He is published in the area of valuation and is a frequent speaker on the issue of law firm financial management.

Brennan spent over 100 hours on his valuation of FPM and drafted a 48-page report. Brennan's report demonstrated several different business valuation approaches for comparison. Brennan testified that although market-based, asset-based, and income-based approaches are each generally accepted, the income approach is best for valuing law firms. Brennan stated the market-based approach is not useful for valuing law firms, because such businesses are privately owned and therefore a firm's private transaction data is not publicly available to be used to compare value with other businesses in the market. As for an asset-based approach, Brennan testified firm assets must be adjusted down to their cash value in order to determine the asset's "net realizable value." Without this adjustment, assets such as encumbered assets and uncollectible accounts receivable would be overvalued.

Brennan testified that the income approach has several subsets, including the discounted cashflow approach and the "capitalization of economic income" approach. Brennan's methodology focused on future cashflows and relied on 5 years of historical income statements which were adjusted to normalize the income stream by removing nonrecurring expenses and adding liabilities not present on income tax forms. Brennan's analysis considered economic environment risks, government regulation risks, and risks specific to FPM such as sustainability, infrastructure, and technological and data security risks. Brennan employed the "Ibbotson Build-Up Method" to determine an appropriate discount rate which considered a risk-free rate, an equity premium, systemic environmental risk unique to the legal industry, and specific risks unique to FPM such as aging partners generating the majority of the client revenue and lower-than-average collection rates, coupled with an inability to pursue legal action against nonpaying clients. Brennan also emphasized that certain factors limit the control and marketability of a law firm, including that only attorneys can own law firms, that lawyers cannot ethically restrict their ability to serve

clients through the use of noncompete agreements, and that most firms have partnership agreements which control compensation and/or admission into the firm. In considering all of these factors, Brennan applied a 60-percent discount to Assam's partnership interest. Brennan's ultimate opinion was a valuation of $590,000.

### (b) Eide Bailly

Flanagan, the director of Eide Bailly's business valuation department, and Fullerton, a senior official in Eide Bailly's business valuation department, coauthored two reports regarding the value of Assam's interest. Their reports complied with industry standards outlined by the "Statements on Standards for Valuation Services" and the National Association of Certified Valuation and Analysts. The first report was a calculation engagement in 2014, and the second report was a more detailed valuation engagement in 2016. Between Flanagan and Fullerton, approximately 50 hours were spent compiling the second report.

Flanagan is a certified public accountant who is a member of the American Institute of Certified Public Accountants. Flanagan also holds the designation of being accredited in business valuation. Fullerton holds a juris doctorate degree, a master's degree in business administration, and a bachelor of science degree in economics with a minor in accounting.

In his practice, Flanagan performs between 150 and 200 business valuations per year. Fullerton testified he had performed 300 business valuations in his career. Flanagan and Fullerton performed business valuations for various industries including wholesale, retail, manufacturing, insurance, real estate holding companies, restaurants, dental practices, construction, and farming operations. Flanagan had performed one law firm valuation, and Fullerton had not performed a law firm valuation prior to this case. Neither had ever performed financial consulting services for a law firm or had published any scholarly articles in the area of law firm valuation.

Eide Bailly's opinion also employed a buildup rate which included industry risk and firm risk to reach a discount rate of 4 percent. The opinion also incorporated a 10-percent discount for lack of control as to nonoperating assets and a 5-percent discount for lack of marketability, because the Partnership Agreement provides a market for the sale of those shares.

Flanagan admitted his valuation assumed that in a fair market value analysis, FPM should be understood as the specific hypothetical buyer of Assam's interest. Fullerton admitted this assumption was part of Eide Bailly's scope of engagement. In addition, Fullerton testified that Assam suggested to Eide Bailly that the reference to fair market value in the Partnership Agreement should equate to fair value. Fullerton further testified that fair value is essentially the same thing as fair market value without any discounts for lack of control or lack of marketability.

Prior to commencing the valuation engagement, Assam's counsel sent a letter to Eide Bailly, dated April 28, 2016, which indicated:

> The District of Columbia statutes permit a partnership agreement or a limited partnership agreement to specify buy-out terms. The [Partnership] Agreement in this case uses the phrase "fair market value". However, the [Partnership] Agreement provides for a market within [FPM] and its Equity Partners. This means the transaction occurs at a fair price and on fair terms, not as if the sale were to a stranger. The internal market assures retention of client relationships, partnership identity, business continuity, and avoidance of startup costs and cash flow limitations. It is . . . Assam's view that these circumstances require that "fair market value" be understood as the fair value of the partner interest in the context of the market created by the [Partnership] Agreement itself. This is, we think, the same as "fair value" in model corporate and business entity statutes.

In their reports, Flanagan and Fullerton used an income approach which utilized FPM's average normalized annual pretax revenue over a 4-year period. Eide Bailly also upwardly adjusted the value of the partnership due to its having a passthrough entity tax status. Flanagan testified that passthrough tax status is, in effect, a capitalization of taxes saved because FPM, as a limited liability partnership, is not subject to corporate taxation.

According to Flanagan's testimony, Eide Bailly's calculation engagement in 2014 concluded the value of Assam's interest in FPM to be $3,420,000. Eide Bailly's valuation engagement in 2016, using more recent revenue streams, concluded the value of Assam's interest to be $3,120,000. Eide Bailly's valuation accounted for FPM's nonoperating assets, such as an interest in real estate and dormant accounts receivable.

### (c) Stadler

Stadler was engaged by Assam to review and compare the fair market value opinions of Brennan, Eide Bailly, and Assam. Stadler is a certified public accountant who holds a juris doctorate and a master's degree in professional accountancy. Stadler also has an accreditation in business valuation. Stadler has never worked in a law firm and has valued only one other law firm.

At Assam's request, Stadler examined only Brennan's valuation report, Eide Bailly's calculation report, and Assam's calculation report, and no other evidence. In doing so, Stadler did not develop an opinion as to value. Stadler identified deficiencies in each of the reports he reviewed. In the Eide Bailly report, Stadler opined that the failure to include 2010 data was a concern, that long-term growth rate was too high, and that the capitalization rate was too low. In regard to Brennan's report, Stadler found fault in the capitalization rate as being too high and the discount for lack of control and lack of marketability as being too high. Ultimately, Stadler concluded

that Brennan's opinion was understated by $1,235,000 and that Eide Bailly's opinion was overstated by $1,275,000. Stadler fundamentally disagreed with Assam's approach and described Assam's valuation as not being credible "in any respect" and "ridiculous."

## (d) Assam

Assam is a financial attorney whose practice includes business valuation matters. Assam valued his interest in FPM at $4,877,850. Assam testified his valuation included his 23.25-percent share of the $10 million in written-off accounts receivable. Assam encouraged the court to reject his experts' valuations and adopt his own.

## 3. Trial Court Judgment

In its written order, the court found the proper remedy was declaratory judgment; it dismissed Assam's counterclaim and declined to award attorney fees. In doing so, the court found FPM's decision to write off approximately $10 million in old accounts receivable was not done in bad faith or with an intent to harm Assam, because the writeoff equally affected all equity partners and was set on the agenda for the partners' meeting prior to Assam's notice of resignation.

The court also determined, based on the language of the Partnership Agreement, that Assam's interest was the fair market value of his equity partnership interest in FPM as of the date of his notice of voluntary withdrawal, October 2, 2014.

The court further found Assam's valuation opinion was "unreliable and not credible." The court accepted Assam's testimony that the court should not adopt the opinions offered by Eide Bailly or Stadler and found that Assam attempted to "influence in an upward manner" Eide Bailly's conclusion as to the fair market value of Assam's interest. The court concluded that the April 28, 2016, letter from Assam's counsel to Eide Bailly showed that Eide Bailly's "calculation engagement" report included an incorrect assumption that FPM must be

the hypothetical buyer of Assam's interest under a fair market value analysis.

The court declined to adopt Eide Bailly's opinion, because Flanagan and Fullerton collectively had valued a law firm on only one other occasion; neither had ever worked at a law firm, been a chief financial officer for a law firm, or provided financial consulting services to a law firm; and neither had published any scholarly articles in the area of law firm valuation. The court noted that Stadler also lacked comparable expertise in law firm valuation for these same reasons.

The court found that the testimony of Brennan was credible; Brennan's 60-percent lack-of-control and marketability discount was credible; Brennan's discounts were appropriate as part of a "fair market value" analysis, because they helped replicate a public marketplace for a private entity; Brennan's discount analysis was consistent with the fair market value standard of a hypothetical buyer's ability to convert the ownership interest to cash and control the investment; and Brennan was the only expert to weigh risk factors which were credible and relevant to determining the fair market value test of a fully informed hypothetical willing buyer's desire to maximize his economic interest.

The court found that the Partnership Agreement was not ambiguous; the Partnership Agreement did not contain a choice-of-law provision; there was no conflict with Nebraska law and District of Columbia law with regard to interpretation of a contract; if there were a conflict, Nebraska law would control due to Nebraska's interest in and contacts with the dispute; and neither party had breached the Partnership Agreement.

The court found and declared that the fair market value of Assam's equity partner interest in FPM is $590,000; pursuant to the Partnership Agreement, FPM may pay Assam this amount; and Assam was not entitled to a money judgment or attorney fees.

Assam appealed, and we moved the case to our docket.

## II. ASSIGNMENTS OF ERROR

Assam assigns, restated, that the district court erred by (1) failing to apply District of Columbia law; (2) finding FPM did not breach the Partnership Agreement; (3) adopting the opinion of FPM's expert, Brennan, whose valuation opinion excluded approximately $10 million in old accounts receivable, as well as the value of real estate, automobiles, tenant improvements, and equipment; and (4) failing to award Assam a money judgment and attorney fees.

## III. STANDARD OF REVIEW

[1-3] An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute.[1] An action for a partnership dissolution and accounting between partners is one in equity and is reviewed de novo on the record.[2] In reviewing an equity action for a declaratory judgment, an appellate court tries factual issues de novo on the record and reaches a conclusion independent of the findings of the trial court, subject to the rule that where credible evidence is in conflict on material issues of fact, the reviewing court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.[3]

---

[1] *Christiansen v. County of Douglas*, 288 Neb. 564, 849 N.W.2d 493 (2014); *Vlach v. Vlach*, 286 Neb. 141, 835 N.W.2d 72 (2013); *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994).

[2] *Robertson v. Jacobs Cattle Co.*, 288 Neb. 846, 852 N.W.2d 325 (2014); *In re Dissolution & Winding Up of KeyTronics*, 274 Neb. 936, 744 N.W.2d 425 (2008); *Bass v. Dalton*, 213 Neb. 360, 329 N.W.2d 115 (1983). See *Darr v. D.R.S. Investments*, 232 Neb. 507, 441 N.W.2d 197 (1989).

[3] *Gast v. Peters*, 267 Neb. 18, 671 N.W.2d 758 (2003); *Lake Arrowhead v. Jolliffe*, 263 Neb. 354, 639 N.W.2d 905 (2002). See *Badran v. Bertrand*, 214 Neb. 413, 334 N.W.2d 184 (1983).

[4,5] The interpretation of a partnership agreement presents a question of law.[4] An appellate court independently reviews a lower court's rulings on questions of law.[5]

## IV. ANALYSIS

### 1. No Conflict of Laws

In Assam's first assignment of error, he claims that the district court erred by determining that no conflict in substantive law existed between District of Columbia law and Nebraska law, as pertaining to the governing effect of the Partnership Agreement. Assam argues the district court erred when it concluded that if there were a conflict of laws, Nebraska law would control over District of Columbia law, because of Nebraska's pertinent interest in the subject matter. Assam further argues that the choice of law impacts three legal issues, including what constitutes a breach of duty by FPM to Assam, what is "fair market value," and attorney fees.

As we will discuss in more detail later, Assam did not properly raise a claim for breach of contract; as a result, any claim that the laws of the District of Columbia differ from the laws of the State of Nebraska on breach of contract is without merit. In addition, since we find that Assam was not entitled to attorney fees, any difference of law on that issue is irrelevant.

The only remaining issue is the determination of fair market value of Assam's partnership interest. The record indicates that FPM was organized as a Washington, D.C., limited liability partnership. In addition, the Partnership Agreement does not contain a specific choice-of-law provision, and District of Columbia law does not allow for such a provision.[6]

---

[4] *Robertson, supra* note 2; *Shoemaker v. Shoemaker*, 275 Neb. 112, 745 N.W.2d 299 (2008).

[5] *Id*.

[6] D.C. Code Ann. § 29-701.07(b)(2) (West, Westlaw through 2013 legislation).

As our analysis will show, the determination of fair market value is controlled by the Partnership Agreement and no real conflict exists between the laws of the District of Columbia and the laws of the State of Nebraska with respect to the controlling effect of partnership agreements.

[6,7] In answering any choice-of-law question, a court first asks whether there is any real conflict between the laws of the states.[7] An actual conflict exists when a legal issue is resolved differently under the law of two states.[8] We agree with the district court when it found there was no conflict between District of Columbia and Nebraska substantive law governing the determination of Assam's equity interest.

Under Nebraska's Uniform Partnership Act of 1998,[9] FPM is a "foreign limited liability partnership," because FPM was formed under the laws of the District of Columbia.[10] Section 67-457 provides that the law under which a foreign limited liability partnership is formed governs relations among the partners and between the partners and the partnership.

Under the laws of the District of Columbia, relations among the partners and between the partners and the partnership are governed under the controlling partnership agreement.[11] In addition, under Nebraska law, relations among the partners and between the partners and the partnership are also governed by the partnership agreement.[12] Thus, whether the laws of the District of Columbia or the laws of the State of Nebraska are applied, the terms of the partnership agreement are controlling. As a result, no actual conflict of laws exists.

---

[7] *O'Brien v. Cessna Aircraft Co.*, 298 Neb. 109, 903 N.W.2d 432 (2017).

[8] *Id.*

[9] Neb. Rev. Stat. §§ 67-401 to 67-467 (Reissue 2009 & Cum. Supp. 2014).

[10] See, § 67-402(4); D.C. Code Ann. § 29-701.06 (West, Westlaw through 2013 legislation).

[11] D.C. Code Ann. § 29-701.07(a).

[12] § 67-404.

Assuming without deciding that the district court erred when it determined that if there were a difference in the law of the State of Nebraska and the law of the District of Columbia, Nebraska law would apply exclusively, any such error was harmless.

[8] The Partnership Agreement is clear and unambiguous. A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.[13] Therefore, the terms of the Partnership Agreement provide the legal framework for our analysis.

## 2. NO BREACH OF CONTRACT

In Assam's second assignment of error, he claims that the district court erred by failing to find FPM breached the Partnership Agreement. We find no merit to this assignment of error.

[9,10] Assam did not assert an independent claim for breach of contract, but merely asserted a breach of contract claim as an affirmative defense to FPM's amended complaint. At the commencement of trial, Assam clarified that he was seeking only an accounting and a fair valuation of his interest in FPM. We determine the nature of an action from the relief sought.[14] Even though Assam's first two assignments of error advance breach of contract arguments, at oral argument, Assam emphasized to this court that this is a proceeding in equity. A suit for damages arising from breach of a contract presents an action at law.[15]

We agree with the district court that this is a declaration of rights proceeding. The Partnership Agreement does not specify a particular amount due to Assam or a time period for payment.

---

[13] *Frohberg Elec. Co. v. Grossenburg Implement*, 297 Neb. 356, 900 N.W.2d 32 (2017).

[14] See *Elting v. Elting*, 288 Neb. 404, 849 N.W.2d 444 (2014).

[15] *Id.*

Instead, the Partnership Agreement requires that FPM pay Assam "an amount equal to 100% of the fair market value" of his 23.25-percent interest. The relief sought by both parties is the determination of the "fair market value" of Assam's interest. Consistent with Assam's view, we find the nature of the dispute to be one in equity, and as a result, this assignment of error is without merit.

### 3. District Court Did Not Err In Determining Assam's Equity Interest

In Assam's third assignment of error, he claims the district court erred when it adopted the opinion of Brennan, because Brennan's opinion did not account for FPM's nonoperating assets. Assam claims the court erred by assigning no value to approximately $10 million in uncollectable accounts receivable and FPM's real estate investments. We find no merit to this assignment of error.

### (a) Conclusions of Law

[11,12] The trier of fact is not bound to accept expert opinion testimony.[16] The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.[17] Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence.[18]

[13] The credibility of a witness is a question for the trier of fact, and it is within its province to credit the whole of the

---

[16] *Green v. Box Butte General Hosp.*, 284 Neb. 243, 818 N.W.2d 589 (2012). See *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018).

[17] *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012).

[18] *Marston v. Drobny*, 166 Neb. 747, 90 N.W.2d 408 (1958). See *Maloney v. Kaminski*, 220 Neb. 55, 368 N.W.2d 447 (1985).

witness' testimony, or any part of it, which seemed to it to be convincing, and reject so much of it as in its judgment is not entitled to credit.[19]

[14-16] Under the laws of the District of Columbia, "fair market value" is the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under compulsion to buy or to sell.[20] The willing buyer-willing seller rule presumes that a potential transaction is to be analyzed from the viewpoint of a hypothetical buyer whose only goal is to maximize his or her advantage.[21] The willing buyer-willing seller rule is applied using the viewpoint of an objective hypothetical buyer, rather than a subjective buyer.[22]

### (b) Analysis

The evidence of fair market value included the opinions of Brennan, Assam, Flanagan, Fullerton, and Stadler. Each expert posited a different fair market value, and each based his opinion on different factors. Just as the trial court did, we too find that there is evidence in conflict on material issues of fact concerning the appropriate considerations in valuing Assam's fair market value interest. As a result, under our de novo review, we consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.[23]

In reaching his opinion that the fair market value of his ownership interest was $4,877,850, Assam used the asset approach, the income approach, and the market approach. Assam testified

---

[19] *General Fiberglass Supply v. Roemer*, 256 Neb. 810, 594 N.W.2d 283 (1999); *In re Estate of Ross*, 19 Neb. App. 355, 810 N.W.2d 435 (2011).

[20] *Adkins Ltd. Ptp. v. O Street Management*, 56 A.3d 1159 (D.C. 2012).

[21] *Eisenberg v. C.I.R.*, 155 F.3d 50 (2d Cir. 1998); *Estate of Curry v. United States*, 706 F.2d 1424 (7th Cir. 1983).

[22] See *Estate of Bright v. United States*, 658 F.2d 999 (5th Cir. 1981).

[23] See cases cited *supra* note 3.

that in his practice, he routinely used business valuations to assist his clients in obtaining financing and would retain individuals to perform the business valuations. In determining how to prepare his valuation, Assam testified that he relied upon "some articles" that he read, including one by the American Bar Association and one from "Inc. Magazine."

In preparing his valuation, Assam included in the asset approach real estate, automobiles, tenant improvements, equipment, and $10 million of old accounts receivable. For the income approach, he simply added 2013 income figures together with estimated 2014 income figures and divided the sum by two. For the market approach, he determined an average annual gross revenue (the amount determined in the income approach) and multiplied it by two. Ultimately, he determined amounts for each valuation method, added the values together, divided the total by three, and multiplied the amount by his partnership interest. Nothing in the record supports the valuation process used by Assam. In fact, Assam's own expert, Stadler, testified that Assam's valuation was "ridiculous."

In regard to Eide Bailly's opinion as to fair market value, both Flanagan and Fullerton testified that it was premised upon FPM's being the hypothetical buyer. However, as mentioned above, fair market value is the price that a willing buyer would pay a willing seller. A willing buyer is presumed to be a hypothetical buyer whose only goal is to maximize his or her advantage. The willing buyer is considered from the viewpoint of an objective hypothetical buyer, rather than a subjective buyer. In using FPM as the willing buyer, Eide Bailly's opinion failed to fully consider discounts for lack of control and lack of marketability.

In addition, Eide Bailly employed 4 years of income instead of 5 years of income. In doing so, Eide Bailly disregarded 2010 income based on the determination that 2010 income was lower than the other years and was nonrepresentative of FPM's regular annual income. However, both Brennan and Stadler testified that using the income figures over a 5-year

period was preferred over using income figures over a 4-year period. Even Flanagan testified that, typically, they use a sample of 5 years of income. Additionally, Eide Bailly annualized 2014 income, because they did not have final figures for that year when preparing the report in May 2016. However, the record indicates that the 2014 income figures were finalized in March 2015.

Eide Bailly also adjusted the value of FPM due to having a "pass-through entity tax status." However, Flanagan testified that this passthrough status had not been accepted by the U.S. Tax Court.

Further, though Flanagan and Fullerton are in the profession of preparing business valuation, neither had significant experience in valuating law firms. Prior to their engagement with Assam, Flanagan had performed only one law firm valuation and Fullerton had performed no law firm valuations.

Each of these decisions by Eide Bailly upwardly impacted its valuation. As a result, we agree with the district court that the valuation determined by Eide Bailly of $3,120,000 does not accurately reflect the value of FPM as of October 2, 2014. Albeit for different reasons, Assam also testified that Eide Bailly's opinion should not be followed by the court.

In regard to Stadler's testimony that Brennan's opinion was understated by $1,235,000 and that Eide Bailly's opinion was overstated by $1,275,000, Assam testified that the court should not adopt Stadler's analysis. In addition, the record indicates that Stadler has limited experience in valuating law firms, Stadler testified that Brennan was more experienced in that particular field, and Stadler examined only the reports of the other experts and no other evidence. Further, Stadler used an industry risk premium for companies having much larger revenues than FPM; he used a lower specific company risk premium without reviewing the Partnership Agreement or any financial documents of FPM; and he used the passthrough entity tax status, which has not been widely adopted by the U.S. Tax Court. All of these decisions increased his "opinion"

of FPM's fair market value. Lastly, Stadler included approximately $2.5 million of goodwill, which from the evidence is attributable to personal goodwill of the remaining partners as opposed to goodwill of FPM, resulting in an overstating of the fair market value by $573,000. As a result, we agree that Stadler's determination of value was not accurate.

In regard to Brennan's opinion, the trial court noted his vast experience in valuating law firms, including working for a law firm management consulting group dealing with over 500 law firms, working as an accountant and auditor, and serving as chief financial officer and executive director for two law firms. At the time of trial, Brennan had also performed approximately 25 law firm valuations and had testified in court seven times as an expert in law firm valuation. Ultimately, the trial court expressly based its findings on a credibility determination which accepted Brennan's version of the facts over Assam's and Eide Bailly's. The court found Brennan's testimony credible and controlling, because he implemented an approach which valued Assam's interest in the context of a market. The court therefore found the 60-percent discount for lack of control and marketability assigned by Brennan to be credible, because of the limitations presented by Assam's minority interest in a law firm with a specialized practice area and equity partnership makeup such as FPM. The court found that Assam and Eide Bailly sought to remove the need for a market from the fair market value analysis dictated by the Partnership Agreement and that, therefore, their small discounts for lack of control and marketability were not credible.

The record indicates that Brennan considered several different business valuation approaches for comparison, including market-based, asset-based, and income-based approaches. Brennan was able to articulate why the income approach was the most suitable valuation method. Brennan used income figures for 5 years as opposed to 4 years, and he did not apply the passthrough entity tax status calculation. Brennan employed

the "Ibbotson Build-Up Method" to determine an appropriate discount rate, and his analysis considered economic environment risks, government regulation risks, and risks specific to FPM such as sustainability, infrastructure, and technological and data security risks. Though Brennan's capitalization and discount rates were significantly higher than those propounded by the other experts, Brennan was able to articulate why law firms should be valued differently from other professional services industries. We therefore agree with the district court that Brennan's opinion of value as to FPM is the most appropriate value.

In regard to FPM's decision to write off approximately $10 million in old accounts receivable, the trial court found that it was not done in bad faith or with an intent to harm Assam. Specifically, the court noted that the writeoff equally affected all equity partners.

At trial, Peebles testified that the accounts receivable were "years old" and that the decision to write off the receivables was not made suddenly but was part of an ongoing analysis of compensation, partner continuity, personnel, and finances. He further testified that each of the partners was charged with the responsibility to review the accounts he was associated with and to make a determination as to collectability. Morgan testified that FPM's collection rate was close to 70 percent. Assam testified that the aggregate of the accounts receivable was in excess of $15 million, of which $10.8 million was over 120 days old.

Assam also testified that he was not part of any decision to write off the accounts receivable. Brennan testified that the longer a receivable ages, the less likely it will be collected in full, and that as they continue to age, especially beyond a year, it is unlikely that a firm would collect any such receivable. Brennan also testified that the partners made a specific determination for each of the receivables to be written off, that some of the accounts were 4 to 5 years old, and that the partners determined that nothing more could be done to

collect the accounts. As a result, Brennan opined that the uncollectable accounts receivable were appropriately written off, because that was a correct reflection of the "net realizable value" of the assets. Even Eide Bailly's valuation report indicated that nearly $9 million in accounts receivable was likely uncollectable.

Despite Assam's testimony that the writing off of accounts receivable was not discussed in 2014, he also testified that the subject of the writeoff was on the agenda for the partners' meeting prior to the night he sent his notice of withdrawal. In addition, the majority of FPM's clients were Native American tribes and therefore entitled to sovereign immunity, preventing FPM from bringing suit to collect on unpaid legal fees. As a result, we agree with the district court that the writeoff of accounts receivable was not improper.

Finally, Assam contends that the trial court failed to apply any value for the assets of FPM, including the building and the vehicles. However, all of the experts, with the exception of Assam, testified that the asset approach was not the best method to value FPM, due to the absence of significant capital. The income approach adopted by the trial court took into consideration FPM's past and present revenue stream and determined an appropriate fair market value for it.

We agree with the trial court that Brennan's testimony is persuasive and controlling. Based upon our de novo review, we find no merit to this assignment of error.

### 4. FAILURE TO AWARD MONEY JUDGMENT AND ATTORNEY FEES

Because we find no error in the district court's ruling that FPM did not breach the Partnership Agreement, Assam is not entitled to a money judgment. Though a court may grant a money judgment as consequential relief in a declaratory judgment action,[24] FPM was the entity seeking the declaratory

---

[24] See *Hoiengs v. County of Adams*, 245 Neb. 877, 516 N.W.2d 223 (1994).

relief. In its pleadings, FPM did not seek a money judgment. Only Assam sought a money judgment, which was part of his claim for breach of contract. Having failed to prove the elements of a breach of contract, Assam is not entitled to a money judgment. Consequently, the district court did not err in declining to award him a money judgment.

In regard to Assam's request for attorney fees, the Partnership Agreement allows for attorney fees for any prevailing party who was required to institute an action or proceeding to enforce any term or provision of the Partnership Agreement. However, because we find no merit to Assam's claim that FPM breached the Partnership Agreement or that the district court erred by adopting the valuation opinion of Brennan, Assam was not a prevailing party. The district court did not err in refusing to award Assam attorney fees.

## V. CONCLUSION

For the foregoing reasons, we affirm the order of the district court which declared Assam's interest in FPM to be $590,000, and that FPM should pay Assam such sum according to the terms of the Partnership Agreement.

AFFIRMED.

KELCH, J., not participating in the decision.
WRIGHT, J., not participating.