IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

BAGLEY V. SARGENT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RYAN BAGLEY, APPELLANT,

V.

WILLIAM SARGENT, APPELLEE.

Filed February 25, 2020.    No. A-19-246.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Vacated and remanded for further proceedings.

Thomas C. Dorwart and, on brief, Anthony W. Liakos, of Govier, Katskee, Suing & Maxell, P.C., L.L.O., for appellant.

Jeffrey A. Wagner and Kyle J. Flentje, of Wagner, Meehan & Watson, L.L.P., for appellee.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

WELCH, Judge.

### INTRODUCTION

Ryan Bagley filed a complaint alleging that he and William Sargent established a partnership concerning the purchase, management, rental, renovation, and resale of real property; that Sargent breached the partnership agreement; and that Bagley was entitled to an accounting, dissolution of the partnership, distribution of its assets, and damages. Bagley appeals the order of the Sarpy County District Court finding that "[Bagley] has failed to meet his burden of proof in his complaint. The evidence offered is insufficient for this court to find that [Sargent] breached any of the terms of the partnership agreement as it existed between the parties." Bagley has assigned that the court erred in finding that Bagley failed to meet his burden of proof, erred in failing to enter a judgment against Sargent, and erred in dismissing Bagley's complaint. For the

- 1 -

reasons set forth herein, we find that the district court lacked jurisdiction over this matter due to the failure of Bagley to add an indispensable party to this action. Therefore, we vacate the order of the district court and remand for further proceedings once the indispensable party is included as a party to this action.

STATEMENT OF FACTS

Bagley and Sargent were long-time friends and served in the military together. Both agreed that prior to July 2014, they discussed the possibility of forming a partnership for the purchase, management, rent, and resale of real estate. According to Sargent, the parties never reached an agreement governing the proposed venture, while Bagley alleged a partnership was formed and then breached.

According to Bagley, Sargent agreed to a partnership in July 2014. Bagley testified that at that time, just prior to his retirement from the military, he was looking for a new line of work. He began researching real estate and came across a "phenomenal deal" but did not have the money to back it. Bagley testified that he then approached Sargent with the concept of Sargent providing money to acquire properties that Bagley would identify, and that Bagley, who already owned two rental properties, would find tenants for the properties, would manage and maintain the properties utilizing contacts he had in the industry, and then eventually sell the properties and split the profits 50/50. As Bagley stated, "in essence, my partnership was to do everything but provide the funds for the property [acquisitions]." Bagley stated that he then brought the property he discovered to Sargent's attention, that they reviewed it together and agreed to "move forward" with the partnership. The particular property Bagley identified was located on Halifax Drive (herein referred to as the "Halifax Property"). Bagley testified that the Halifax Property was acquired in the names of Sargent and his wife, Joyce Sargent; that Bagley made improvements to the property; that he identified the tenant for the property; and that the Halifax Property has eventually sold but Sargent refused to split the profits from the sale. Bagley then testified that he and Sargent followed the same protocol with a property located on Kelly Drive, although the parties had not liquidated that property.

Sargent testified that although he and Bagley discussed a possible partnership, none was ever formed. He testified that at some point a written agreement was drafted but that it was never signed. In response to the reason the agreement was never entered, Sargent responded:

> We have tried over time, that's one of the sticking things at the beginning was that it wasn't a true 50/50, meaning I was just the money man. I asked Mr. Bagley to put one of his rentals in as him having skin in the game, and it was also to 50/50 on all repairs and labor to the house. And he did neither.

Sargent acknowledged that Bagley brought both the Halifax Property and the Kelly Property to his attention, that he acquired both properties in his and his wife's name, and that Bagley did some work on the properties and was somewhat involved in locating the eventual buyers of the Halifax Property. In connection with Bagley's claim that he was entitled to a split for his work in connection with the alleged partnership, Sargent was asked:

> Q. Okay. After the closing of the property on Halifax Drive, did you make assurances to Mr. Bagley that things would get worked out?

- 2 -

A. There were -- there was talk there. I would like to say that I put in over 200 hours at that house getting it ready to flip. And I outlaid almost $40,000 on the flip of that house that he was out of town and basically did nothing. So --

Q. Do you have anything as you're here today to back up your claim that you put $40,000 into the house?

A. Well, I got my expenses on the house, yes, I do.

Q. So is it your position today there never was any partnership between you and Mr. Bagley?

A. There was never any formal, agreed upon partnership, yes.

. . . .

Q. So is it your position as you sit here today he's entitled to nothing?

A. There's been a figure out there that has been offered and rejected.

Later, Sargent's counsel called Sargent back to the stand as a part of his defense. In connection with his direct questioning of Sargent, the following colloquy ensued:

Q. You wanted certain things as part of the partnership, correct?

A. Yes, sir.

Q. And he didn't want to do those things; is that correct?

A. Yes.

Q. You continued to talk and try to negotiate and come to some agreement; is that correct?

A. Yes, sir.

Q. Did you ever reach that agreement?

A. When we went to the accountant, I expressed to her that it was an agreement would be -- it would be 50/50 along with all of the labor and the costs of flipping the house. That was understood by her under the -- when she did the accounting. And it all said in there that until -- until all the real figures are there, and she didn't allow for repairs and costs and that. So it was totally that's how the agreement was supposed to be. But then he did nothing on the flip of the house, money-wise or --

Sargent then went on to reiterate his perceived failures of Bagley in connection with his "understanding of the agreement."

During Sargent's counsel's cross-examination of Bagley, the following exchange took place:

Q. And then, in fact, on July 17th, 2014, you got a text from Mr. Sargent indicating that this will work out, but the agreement or the terms haven't been reached at that point in time, correct?

A. No sir. The agreements were from the very beginning, as I stated, 50/50. Nothing more. Nothing less.

Q. What was to work out if it was all agreed to?

A. Whatever he had to do with the young lady in the back of the court, because the deal was between him and I from day one for 50/50. Nothing different.

Q. In fact, you were aware that his wife wouldn't do anything unless it was 60/40; isn't that correct?

A. That was an offer they presented, and I told them that was not what we agreed upon. I didn't make the deal with the wife. I made a deal with Mr. Sargent.

During the course of the trial, Bagley offered without objection, and the court received as exhibit 4, a copy of an email from Sargent to Bagley. The email recited:

Ryan,

First of all our original agreement was to buy the houses, hold them and split the proceeds 50/50, houses are not sold, so [you] get nothing until that point. We never talked about early buy out, I have never disputed our agreement.

I told you and even showed you on Friday the mistake that Tara made on her cost, $4000, which would then make the Kelly buyout $20000, which I offered [you] last night. I also have checked and [rechecked] the numbers for Halifax and the $28000 is what it is. 50/50.

I know you [don't] like being threatened, I don't like it either. If you accept the offer I sent [you], text me, and I will have the paperwork drawn up and the money $20000 to you by the end of the week. Same plan as email last night. If not, please contact my lawyer . . . .

Mistakes have been made, I wish [you] luck with your new partner. I am done and will no longer be in business once the payout has been made. I will not speak bad[ly] of our relationship, please do the same for me.

Because of our past relationship, I will split the difference with [you] and give [you] $20000 this week and $29000 in [J]anuary. I am sorry [you] feel the way you expressed, but I think those are your true feelings.

Bill

In February 2019, the district court entered an order finding that Bagley had "failed to meet his burden of proof on his Complaint." The court further found that the evidence offered was insufficient for the court to find that Sargent had breached any of the terms of the partnership agreement as it existed between the parties or to establish damages as allegedly suffered by Bagley in this matter. Consequently, the court entered judgment in favor of Sargent and dismissed Bagley's complaint for partnership dissolution and accounting.

## ASSIGNMENTS OF ERROR

Bagley contends that the district court erred in finding that he failed to meet his burden of proof to establish a breach of the parties' partnership agreement, in failing to enter judgment in favor of Bagley against Sargent, and in dismissing his complaint.

## ANALYSIS

Before reaching Bagley's assignments of error, this court must first determine whether it has jurisdiction. It is the power and duty of an appellate court to determine whether it has

jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties. *J.S. v. Grand Island Public Schools*, 297 Neb. 347, 899 N.W.2d 893 (2017).

This court recently stated in *In re Trust Created by Augustin*, 27 Neb. App. 593, 620-21, 935 N.W.2d 493, 515 (2019):

> [Neb. Rev. Stat. §] 25-323 [(Reissue 2016)] provides in part: "The court may determine any controversy between parties before it when it can be done without prejudice to the rights of others or by saving their rights; but when a determination of the controversy cannot be had without the presence of other parties, the court must order them to be brought in."
>
> The language of § 25-323 tracks the traditional distinction between necessary and indispensable parties. *Midwest Renewable Energy v. American Engr. Testing,* 296 Neb. 73, 894 N.W.2d 221 (2017). The Nebraska Supreme Court addressed that distinction, explaining: "'"'Necessary parties[]' [are parties] who have an interest in the controversy, and should ordinarily be joined unless their interests are separable so that the court can, without injustice, proceed in their absence[.] 'Indispensable parties[]' [are parties] whose interest is such that a final decree cannot be entered without affecting them, or that termination of controversy in their absence would be inconsistent with equity."'. . . The inclusion of a necessary party is within the trial court's discretion. . . . However, there is no discretion as to the inclusion of an indispensable party.'" *Id.* at 90, 894 N.W.2d at 236. Therefore, the first clause of § 25-323 makes the inclusion of necessary parties discretionary when a controversy of interest to them is severable from their rights. See *Midwest Renewable Energy v. American Engr. Testing, supra.* "The second clause, however, mandates the district court order indispensable parties be brought into the controversy." *Id.* at 90, 894 N.W.2d at 236. All persons interested in the contract or property involved in an action are necessary parties, whereas all persons whose interests therein may be affected by a decree in equity are indispensable parties. See *Midwest Renewable Energy v. American Engr. Testing, supra.*
>
> The absence of an indispensable party to a controversy deprives the court of subject matter jurisdiction to determine the controversy and cannot be waived. *Id.* When a lower court lacks the power, that is, the subject matter jurisdiction, to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court. *Id.* When it appears that all indispensable parties to a proper and complete determination of an equity cause were not before the court, an appellate court will remand the cause for the purpose of having such parties brought in. See *id.* Necessary parties are parties who have an interest in the controversy, and should ordinarily be joined unless their interests are separable so that the court can, without injustice, proceed in their absence. *Id.*

An action for a partnership dissolution and accounting between partners is one in equity. *Fredericks Peebles v. Assam*, 300 Neb. 670, 915 N.W.2d 770 (2018).

The Nebraska Supreme Court had occasion to discuss the concept of indispensable parties in *Pestal v. Malone*, 275 Neb. 891, 895-96, 750 N.W.2d 350, 354-55 (2008):

We have stated that an indispensable or necessary party is one whose interest in the subject matter of the controversy is such that the controversy cannot be finally adjudicated without affecting the necessary party's interest or which is such that not to address the interest of the necessary party would leave the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience. See *In re Adoption of Kenten H.,* 272 Neb. 846, 725 N.W.2d 548 (2007).

For example, the court in *Pestal* held:

We have long recognized in adverse possession and easement actions the importance of naming as parties all persons or entities who have or may have an interest in the property that is the subject of the action. In *Whitaker v. Gering Irr. Dist.,* 183 Neb. 290, 160 N.W.2d 186 (1968), we set aside the judgment and remanded the cause for a new trial when we determined on appeal that persons who had an interest in the real property that was the subject of the action had not been brought in as parties. In *Whitaker,* we stated that "[t]he defendant's claim of adverse possession . . . whether it be limited to an easement or not, certainly could not be established as against [persons who] are not parties to the action" and that "[w]hen it appears that all indispensable parties to a proper and complete determination of an equity cause were not before the district court, [an appellate court] will remand the cause for the purpose of having such parties brought in." *Id.* at 294-95, 160 N.W.2d at 188-89.

275 Neb. at 896, 750 N.W.2d at 355.

Here, Bagley claims that both the Halifax Property and the Kelly Property were partnership properties and that he was entitled to a 50/50 share of the profits generated therefrom. Further, in connection with that claim, Bagley requested an accounting and dissolution of the partnership along with liquidation of the partnership assets. As stated in the facts section of this opinion, Sargent is listed as a co-owner with his wife, Joyce, of what Bagley alleges to be partnership property. However, Sargent's wife, Joyce, was not included as a party to these proceedings. Because the subject matter of the controversy is such that the controversy could not be adjudicated without affecting Joyce's interest in the properties, Joyce is an indispensable party whose presence was necessary to confer jurisdiction on the district court.

Although we recognize that based upon the district court's finding and prior to us addressing Bagley's assignments of error that the current order would not adversely impact Joyce's interest in the Halifax Property and Kelly Property, this court has not and will not further determine whether assigned portions of that order were made in error because of the lack of jurisdiction to do so. When a lower court lacks the power, that is, the subject matter jurisdiction, to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court. *Midwest Renewable Energy v. American Engr. Testing*, 296 Neb. 73, 894 N.W.2d 221 (2017)*; In re Trust Created by Augustin*, 27 Neb. App. 593, 935 N.W.2d 493 (2019). We note a similar argument was made in *Taylor Oil Co. v. Retikis*, 254 Neb. 275, 280, 575 N.W.2d 870, 874 (1998), wherein the Nebraska Supreme Court held:

- 6 -

At first impression, one might infer that Adams was not an indispensable party, because the district court determined that Taylor Oil did not have an interest in the collateral, and that, therefore, Adams' ownership rights in the collateral were not affected by the district court's ruling. However, such an inference would result in a misapplication of the intent and purpose of the law. The parties are not permitted to first obtain a judgment and then apply the requirements of § 25-21,159 to determine who is a necessary party to an action.

Although *Taylor Oil Co.* was dealing with a potential lien on a property and involved Neb. Rev. Stat. § 25-21,159 (Reissue 1995) in its application, the reasoning of the court is applicable here. Because both this court and the district court were without jurisdiction to hear this controversy without the presence of Joyce as an indispensable party, the order of the district court was void.

## CONCLUSION

Having determined that the district court lacked jurisdiction over this case, we vacate the district court order and remand to the district court for further proceedings once Joyce is included as a party.

VACATED AND REMANDED FOR FURTHER PROCEEDINGS.